IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| CLEMENTE JAVIER AGUIRRE-JARQUIN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| V. | ) | |
| | ) | |
| | ) | Judge: |
| SEMINOLE COUNTY, | ) | |
| DEPUTY SHERIFF ROBERT HEMMERT, | ) | |
| CRIME SCENE ANALYST | ) | |
| JACQUELINE GROSSI, | ) | |
| LATENT PRINT EXAMINER | ) | |
| DONNA BIRKS, and | ) | |
| OTHER UNKNOWN OFFICERS OF THE | ) | |
| SEMINOLE COUNTY SHERIFF'S | ) | |
| OFFICE, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

NOW COMES Plaintiff, Clemente Javier Aguirre-Jarquin, by his attorneys Joshua Dubin, Esq., Grant & Eisenhofer, P.A., and Rudolf Widenhouse, complaining of Defendants Seminole County, Florida, Seminole County Sheriff's Office Deputy Robert Hemmert, Florida Department of Law Enforcement Crime Scene Analyst Jacqueline Grossi, Latent Print Examiner Donna Birks, and other unknown officers of the Seminole County Sheriff's Office and states as follows:

## **SUMMARY OF THE CASE**

1.      This is a tragic case of an innocent man who spent more than 14 years incarcerated for a crime he did not commit.  Wrongly accused and convicted of a brutal double homicide, Plaintiff Clemente Javier Aguirre-Jarquin ("Clemente Aguirre" or "Clemente") spent more than ten of those fourteen years on death row awaiting execution before being exonerated.

1

2.      Clemente's nightmare was the direct result of the failure of the Seminole County

Sheriff's office to conduct a constitutionally adequate investigation, free of ethnic stereotypes

and false assumptions, into the 2004 murders of Cheryl Williams ("Cheryl") and Carol Bareis

("Carol").

3.      In short, the defendants in this case ignored the substantial evidence implicating

Samantha Williams ("Samantha"), Cheryl's daughter and Carol's granddaughter, as the

perpetrator.  This evidence included the following uncontested facts:

> (a) Samantha Williams had a long history of mental illness and associated
> violence that was well documented and known to the Seminole County Sheriff's
> Office;
>
> (b) Samantha and her mother Cheryl had engaged in a "ranting and raving"
> argument the night before the bodies were found;
>
> (c) Cheryl was found with 129 stab wounds all over her body, which any
> reasonably trained homicide investigator in 2004 would have known indicated
> "overkill" and a strong emotional attachment between the victims and the
> perpetrator;
>
> (d) Samantha had been at the trailer she occupied with Cheryl and Carol until
> sometime around 11:30 the night before their bodies were found;
>
> (e) Rigor mortis (the stiffening of the body) reaches a peak about twelve hours
> after death in normal circumstances and then subsides over the next twelve
> hours, which any reasonably trained homicide investigator would have known in
> 2004; and
>
> (f) that the condition of the bodies at 9:00 am ("very stiff") indicated that the
> time of death had been 8-12 hours before, or between 9:00 pm and 1:00 am.

4.      Instead, the defendants, motivated consciously or unconsciously by their bias

against undocumented immigrants from countries in Central America, focused instead on

Clemente, who had found the bodies of Cheryl and Carol when he went to their trailer early that

morning.  In doing so, the defendants failed to even investigate the evidence that Clemente had

in fact been in a bar playing pool with friends and acquaintances at the time the murders were

likely committed, and thereafter stayed with friends until only a few hours before the police

arrived at the scene of the crime which, based on the evidence of rigor mortis, ruled Clemente

out as the perpetrator.

5.	Prior to and during his trial, Defendant Hemmert concealed from the State's

Attorney and Clemente's defense counsel *Brady* material and key impeachment evidence about

Samantha Williams' history of mental health issues and Baker Act commitments, as well as

exculpatory evidence from the crime scene.   Samantha Williams became the State's Attorney's

star witness.

6.	In the absence of this exculpatory and impeachment evidence, the jury credited

the testimony of Samantha Williams and on February 28, 2006, convicted Clemente of the

murders of Cheryl Williams and Carol Bareis.  He was sentenced to death on June 30, 2006.

7.	Following his conviction, the Innocence Project, along with Clemente's

appointed appellate counsel, filed motions to have the crime scene blood samples tested.  The

results of that testing revealed that eight deposits of blood in key locations at the crime scene

belonged to Samantha.   In addition, after Clemente's conviction, Samantha had confessed to

multiple people, on various occasions, that she had murdered her mother and grandmother.

8.	On October 27, 2016, the Florida Supreme Court reversed the circuit court's

orders denying Clemente's post-conviction motions, vacated his convictions and sentences, and

remanded for a new trial. Of note, the Court explained that Clemente appeared to be the

"scapegoat" for Samantha's crimes. Nonetheless, the State's Attorney elected to retry Clemente.

9.	Thereafter, during a court ordered deposition of Samantha Williams, she

conceded that she may have committed the murders but blocked them out.

10.     On November 5, 2018, after more than fourteen years in prison for two murders he did not commit, the Seminole County State's Attorney dismissed the case against Clemente Aguirre.  Clemente was released later that day. He now resides in Tampa, Florida.

11.     This case underscores the extraordinary damage that can be done when law enforcement develops tunnel vision, focusing on one suspect and ignoring the glaring red flags that the crime was committed by someone else –  and when they fail to turn over exculpatory and impeachment material to the prosecutor's office for transmittal to the defense.

12.     Clemente Aguirre's incarceration should have never occurred.  Were it not for the flagrant misconduct of the defendants, it never would have happened. As a direct result of the defendants' deliberate, intentional and/or reckless failure to investigate, and their concealment of exculpatory and impeachment information, Clemente Aguirre's civil rights were violated and he was robbed of over 14 years of his life and freedom.  He sustained and continues to sustain severe physical, emotional, and monetary damages as a result of the defendants' conduct, and hereby seeks redress for those injuries.

## PARTIES

13.     Plaintiff, Clemente Javier Aguirre-Jarquin was, at all times relevant to this Complaint, a resident of Seminole County, Florida, in the Middle District of Florida.

14.     Defendant, Robert Hemmert was, at all times relevant to this Complaint, a Deputy Sheriff and lead investigator for the Seminole County Sheriff's Office and was acting under color of state law within the scope of his employment as a public employee.

15.     Defendant, Jacqueline Grossi was, at all times relevant to this Complaint, the lead crime scene analyst for the Florida Department of Law Enforcement.

16.     Defendant, Donna Birks was, at all times relevant to this Complaint, a latent print examiner for the Florida Department of Law Enforcement.

17.     Defendants, who are other unknown officers of the Seminole County Sheriff's Office participated in the misconduct alleged in this Complaint.

18.     Defendant, Seminole County, is a county of the State of Florida, which oversees the Seminole County Sheriff's Office.  Seminole County is obligated by Florida statute to pay any judgment entered against Defendant Seminole County Sheriff's Office and the officers who served as agents of Seminole County while conducting the investigation in this case.  Seminole County is liable for all torts committed by the Sheriff's Officer Defendants while employed by the Seminole County Sheriff's Office pursuant to the doctrine of *respondeat superior*.  Seminole County is additionally responsible for the policies and practices of Seminole County and the Seminole County Sheriff's Office.

## JURISDICTION

19.     This Court has federal question jurisdiction, pursuant to 28 U.S.C. §1331, over claims arising under 42 U.S.C. §1983.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) because they are part of the same case and controversy described by Plaintiff's federal claims.

## VENUE

21.     Pursuant to 28 U.S.C. §1391(b)(2), venue is proper in the Middle District of Florida, the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## JURY DEMAND

22.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff

hereby requests a jury trial on all issues and claims set forth in this Complaint.

## BACKGROUND

23.     In June 2004, Carol, Cheryl and Samantha all lived next door to Mr. Aguirre at

121 Vagabond Way.  Carol was wheelchair bound due to a stoke and Cheryl was her full-time

caregiver.

24.     Prior to June 16, 2004, Samantha had a documented history of mental illness,

including diagnoses of Intermittent Explosive Disorder, Bipolar Disorder, Borderline Personality

Disorder and Psychosis NOS.  She had been involuntarily committed to psychiatric hospitals by

the Seminole County Sheriff's Office in September 2001 and again in June 2002.

25.     In addition to her well-documented psychiatric problems, Samantha Williams

had a lengthy history of conflict with her mother Cheryl, which had resulted in the Seminole

County Sheriff's office being called to the Williams' trailer numerous times.  On at least five

separate occasions, Cheryl had reported to the Sheriff's Office that Samantha had run away from

home and was missing.  On at least two other occasions, the Sheriff's office was called to the

Williams' trailer by Cheryl because of Samantha's violent outbursts, and she was involuntarily

committed to a mental hospital by Cheryl as a result of what Cheryl described as Samantha's

"psychotic behavior."

26.     Prior to June 16, 2004, Clemente Aguirre was an undocumented immigrant

living in the trailer park next door to Carol, Cheryl and Samantha.  Clemente was born in

Honduras in 1980 and came to the United States in March of 2003 to escape the violent drug

gangs that threatened the lives of his friends and family. For Clemente, the United States represented the opportunity for a better life and the escape from persistent danger. Upon arriving in Sanford, Florida, he quickly gained employment and worked three jobs.  He had never been arrested for anything in Honduras or the United States.

27.      After moving into the trailer park, Clemente had become friendly with the Williams family, and often visited their trailer to socialize and drink beer.

## THE MURDERS OF CHERYL WILLIAMS AND CAROL BAREIS

28.      On the evening of June 16, 2004, Samantha and her then boyfriend, Mark Van Sandt ("Van Sandt") had gone to the Williams trailer, intending to stay the night. During that evening, Samantha and Cheryl had gotten into a loud argument.  As a result of this "ranting and raving" argument, Samantha and Van Sandt left the trailer late that night because Cheryl was not going to give them "any peace and quiet."

29.      Shortly before 9:00 am on June 17, 2004, Van Sandt showed back up at the trailer, allegedly to retrieve Samantha's work clothes.  Samantha was not with him.

30.      When Van Sandt arrived at the Williams's trailer, the door was unlocked.   Cheryl was dead, face down in a pool of blood.  When Van Sandt called 911, he reported that Cheryl's body was already cold and very stiff.

31.      Deputy Pensa of the Seminole County Sheriff's Office ("SCSO") arrived at 121 Vagabond Way just shortly after 9:00 a.m. and entered the residence through the back door. Deputy Pensa and Deputy Bates found Cheryl William's body blocking the front door and Carol Bareis lying dead on the living room floor.  Pensa confirmed that the bodies were cold and stiff.

32.      Rigor mortis is the process by which a body gradually stiffens after death.  It develops over about a twelve-hour period when the body is indoors, and then gradually

disappears over the next twelve hours.  When the police arrived at the scene of the murders at about 9 a.m. the next morning, rigor mortis had already made Carol and Cheryl "stiff," which indicated they had been dead for approximately 8-12 hours. This forensic evidence established the likely time of death as sometime between 9:00 pm on June 16 and 1:00 am on June 17, 2004.

33.     The presence of 129 stab wounds on Cheryl Williams body was indicative of what police and forensic experts call "overkill," which is evidence of a strong emotional attachment between the perpetrator and the victim.  Cheryl Williams had many defensive wounds to her arms and legs that indicated she was engaged in a violent struggle for her life. A final stab wound to her lung was the cause of death.

## THE INVESTIGATION OF THE MURDERS

### June 17, 2004

34.     At about 9:50 am on June 17, 2004, Jacqueline Grossi, the lead crime scene analyst for the Florida Department of Law Enforcement and Robert Hemmert, an investigator with the SCSO Major Crimes Unit, arrived at the scene.  Both of these experienced officers knew, or reasonably should have known, that the degree of rigor mortis evident on the two bodies, which were still present at the scene, indicated they had been killed between 9:00 pm and 1:00 am.

35.     At about 11:00 am, during a neighborhood canvas, SCSO Officer Bean and SCSO Officer Perez interviewed Clemente Aguirre.  No translator was present, despite the fact that Clemente spoke extremely limited English. Clemente told the officers he had been at Pretzels, a local billiard's parlor and bar, from about 6:30 pm until about 2:00 am, and then went to his friend Salvador Prado-Cisneros' house.

36.     If the police confirmed Clemente's whereabouts during that timeframe, it

effectively ruled him out as the perpetrator.

37.     At about 11:25 am, SCSO Bean interviewed Mike Weaver, who was the maintenance man at the Mobile Manor trailer park, where Cheryl, Carol and Samantha lived. He told Bean that Cheryl had come by his trailer the previous night around 9:30 pm and had left around 11:00 pm. During this time, he overheard her talking to a friend, Diane Shroyer, about an argument she was having with her daughter at that time.  Weaver told SCSO Bean that Cheryl seemed upset/mad about the argument.

38.     This meant that Cheryl and Carole had likely been killed between 11:00 pm and 1:00 am, after this argument with Samantha.

39.     Upon information and belief, SCSO Bean told SCSO Investigator Hemmert, who was the lead investigator, what he had learned from his canvas.

40.     At about 11:30 am, SCSO lead Investigator Hemmert interviewed Van Sandt. He told Hemmert that when he found Cheryl's body, it was stiff and "[o]bviously she'd been dead for a while."  He confirmed that Samantha and her mother had gotten into an argument at their trailer the night before.

41.     Van Sandt informed Hemmert that he and Samantha decided to leave the trailer to sleep at his parents' house at about 11:30 pm because they "weren't going to get any peace or quiet" there.  When Hemmert asked Van Sandt what Cheryl was "upset about or ranting and raving" about, Van Sandt replied "Just life in general. Just ah . . . upset because I spilled ice on the floor and forgot to pick it up and asking me if I'd ever do that over at my house."

42.     During the interview, Van Sandt told Hemmert that Samantha had been "Baker Acted [involuntarily committed as a danger to herself or others] a couple of times."  Upon information and belief, Hemmert independently knew or reasonably should have known this. In

fact, SCSO Deputy Diane Toranzo, one of the SCSO officers assigned to Hemmert's team to investigate the murders of Cheryl and Carol, had been directly involved in one of Samantha's arrests and involuntary commitments in 2001.

43.     Towards the end of the interview, Hemmert and Van Sandt had the following exchange:

> Hemmert:  Right. Um, well let me ask you this, and this is a tough question, but obviously we have an extremely difficult job at this point and time. *Why in the world do you think somebody would want to do something like this to these poor people?*
>
> Van Sandt: (Inaudible) they've just got the type of people that live around here, some  of them aren't great people or some type of maybe they were on something and they were just unable to ... I don't know, I don't know why. I don't know why, their (*sic*) not, obviously their not blonde, you know what I'm saying, their (*sic*) not cute young girls, their (*sic*) not anything that would normally ... I don't know ... just *somebody had something wrong with their head,* I don't know anything else, I don't know who.
>
> Hemmert:  I agree with you there 'cause *nobody in their right mind does anything like that to people.*

44.     At about 1:35 pm, Hemmert interviewed Samantha. She admitted she had been at the trailer the night before but claimed to have left around 11:00 pm.  When asked whether she and Van Sandt had gone directly to his parents' house after leaving the trailer, she paused more than 27 seconds before answering – and then claimed to have gone first to the house of Phil Keidaish, a friend of Van Sandt's, before admitting they had gone to his parents' house.

45.     When asked if there was anyone she thought would want to harm Cheryl and Carol, she told Hemmert that "Shorty" (Clemente) had let himself inside their trailer on at least three occasions, and that once she had found him standing by her bed at 3:00 am.  She did not provide any evidence that "Shorty" would want to harm Cheryl or Carol, let alone stab Cheryl 129 times.

46.     Hemmert did not question Samantha about her psychiatric history, even though

he thought that "nobody in their right mind does anything like that to people."

47.     At 1:40 pm, Deputy Bean and Sgt. Negri of the SCSO interviewed Mark Van

Sandt's mother.  She was not aware if Samantha was at her house on the morning of June 17,

2004.

48.     Samantha's psychiatric history, the fact she had an argument with Cheryl the

night before, the fact she initially lied to Hemmert about where she went after leaving her

residence, the number of stab wounds on Cheryl's body, which was evidence of "overkill" and

the existence of an emotional attachment between the victim and the perpetrator, and the degree

of rigor mortis that was present in the bodies at 9:00 am, raised significant suspicions about

Samantha's role in the murders.

49.      Despite the numerous red flags pointing to Samantha as the person who stabbed

her mother 129 times in a fit of rage and then killed her grandmother, SCSO investigator

Hemmert did nothing to follow up on this aspect of the investigation.  Instead, he focused the

investigation solely on Clemente, who had always gotten along well with Cheryl and Carol and

had no motive to kill either of them.

50.     Thus, at 7:28 pm on June 17, 2004, three officers from the SCSO, Investigator

Maiorana, Sgt. Negri and Deputy Toranzo (who was there to translate) recorded an interview

with Clemente.  Clemente again told the investigators he had been at Pretzel's on the night of

June 16, 2004, and explained that he had gotten into an altercation with another customer, and

that Altamonte Police had been called to the scene about 1:00 a.m.  He stated he stayed there

until 2:00 am, and then went to his friend Salvador's house for several hours.

51.     Clemente then asked to speak to Toranzo privately, and admitted to her that he

had gone to Cheryl's trailer at about 6:00 – 6:30 that morning and found Cheryl and Carol dead.

He told Toranzo there was blood all over the place.  He also said he had lifted Cheryl up to see if she was alive but let go of her when he realized she was dead and walked back to his residence. He explained that he was in the country illegally, and did not call the police because he was afraid he would be deported.

52.     At 8:55 pm, defendant Special Agent Hidalgo and a female officer interviewed Clemente again for several hours. Clemente repeatedly told them he did not kill anyone and rejected their repeated attempts to get him to admit he might have done this while he was drunk, and just didn't remember.  Clemente told them again he had been at Pretzels on the night of June 16, 2004, and Agent Hidalgo admitted Hemmert had corroborated what Clemente had told Hemmert previously. Hidalgo told Clemente: "*they caught that guy that you had problems with and took him. It's true, it's true because there is a police report.*"

53.     Despite this, Hidalgo continued to press Clemente to admit that he had killed Cheryl and Carol, claiming this was the only way he could help his "Latin brother."  Clemente said he understood what Hidalgo was saying, but could not admit to something he didn't do, and continued to tell Hidalgo "I'm telling you the truth brother, I found their bodies this morning." Hidalgo claimed Clemente's motive had been that Cheryl had refused to have sex with him, and Clemente explained she was old and he had no desire to have sex with her. Clemente directed the police to where he put the clothes he was wearing when he discovered Carol and Cheryl, and consented to allow photographs of his body, buccal swabs and fingernail scrapings.  He also consented to the seizure of his Reebok sneakers.

54.     At the conclusion of this interview, Investigator Hemmert arrested Clemente for evidence tampering/destruction, and he was transported to the jail.  Photographs, a buccal swab and fingernail scrapings were collected, as well as a pair of black shoes.

**June 18, 2004**

55.     After Clemente's arrest, at 12:40 am on June 18, 2004, defendant Grossi executed a search warrant for his residence and any cars on the premises.

56.     At 1:00 am, defendant Hemmert interviewed Salvador Prado-Cisneros.  He confirmed that he and Clemente had been at Pretzels until about 2:00 am, and then went to his residence on Alma Drive.  He estimated that Clemente left his residence between 3 and 4 am that morning.

57.     This information confirmed that Clemente could not have killed Cheryl and Carol between 9:00 pm and 1:00 am, which was the window during which the murder took place, as the degree of rigor mortis indicated.

58.     At about 1:00 pm on June 18, Investigator Bean and Sgt. Negri, assisted by Deputy Castro of the SCSO, interviewed Guillermo Espinosa.  He confirmed that on June 16, 2004, at about 7:00 pm, he saw Clemente, who was on his way out to the bar to play pool, and had been picked up by a friend.  This information further confirmed that Clemente had been at Pretzels on the evening of June 16, 2004, until about 2:00 am on the morning of June 17, 2004, and indicated Clemente was not responsible for the murders of Cheryl and Carol that evening.

**June 19, 2004**

59.     On June 19, 2004 at approximately 10:30 am, defendant Hemmert interviewed David Shupe.  During this interview, Shupe told Hemmert that he had been at Pretzels on the night of June 16, 2004 with his step-father, Robert Torres, and Charles Brown.  He saw Clemente there until about 3:00 am, at which point he left and went to a house on Alma Avenue, and again saw Clemente there.

60.     This information further confirmed that Clemente was not the person who had killed Cheryl and Carol..

**June 20, 2004**

61.     On June 20, 2004, defendant Hemmert interviewed Robert Torres.  He told Hemmert he had picked up his step-son Shupe and Charles Brown from Pretzels early on the morning of June 17, 2004.  They were with two "Latin guys" [apparently referring to Clemente and Salvador] who were pretty drunk.   The "really short" guy (apparently referring to Clemente, who is only 4' 11" tall) had gotten into a fight at the bar earlier that night.  He left Pretzels with Shupe, Brown and the 2 "Latin guys" around 2 am and went to a trailer on Alma with them.

62.     This information further confirmed that Clemente had been at Pretzels until at least 2:00 am, and then had gone to Salvador's trailer on Alma.  He therefore could not have killed Cheryl and Carol earlier that evening, since the rigor mortis evidence indicated they had been killed while he was at Pretzels.

**June 21, 2004**

63.     On June 21, 2004, defendant Hemmert interviewed Charles Brown at the SCSO. He confirmed what Shupe and Torres had told Hemmert.  He had seen Clemente at Pretzels when he arrived there around 1:00 am on June 17, 2004 and had left with him and three other people to travel to a residence on Alma Avenue shortly after 2:00 am.  Brown told Hemmert he knew Samantha, but had stopped hanging out with her because "after a while I started thinking she just wasn't right in her head."

**June 22, 2004 – June 24, 2004**

64.     During this period of time, defendant Grossi finished processing the crime scene by collecting various swabs and other forms of trace evidence.  The crime scene was finally

cleared on June 24, 2004.

65.     On June 24, 2004, Crime Scene Analyst Christine Craig determined that the footwear impressions in suspected blood from the crime scene were "similar in tread design and size" to the Reebok shoes collected from Clemente.  This was consistent with Clemente having found the bodies of Cheryl and Carol on the morning of June 17, 2004.

66.     Also, on June 24, 2004, defendant Birks completed a Latent Fingerprint Report on a left palm impression on the handle of the knife which was the apparent murder weapon, which claimed that there was "a positive identification with the left palm of Clemente Aguirre." This was a complete fabrication.  A Professional Conduct Administrative Review conducted by the Florida Department of Law Enforcement ("FDLE") Crime Laboratory in 2007, after Clemente's conviction, concluded that in fact "no latent prints of value for identification purposes were noted" on the knife handle.

67.     Birks admitted under oath in a deposition, after Clemente had been convicted and sentenced to death, that she had never actually examined the knife, the actual print on the knife, the latent lift from the knife handle, or compared any of these to the print actually taken of Clemente's palm.   This was a gross violation of the minimum standards applicable to latent print examiners in 2004, and was a fabrication of the palm print evidence.

68.     Upon information and belief, no additional investigation was performed by Defendant Hemmert or Defendant Grossi between June 17, 2004 and June 24, 2004.  In particular, there was no investigation conducted of Samantha or Van Sandt after their interviews on June 17, 2004.

**June 25, 2004**

69.     On June 25, 2004, apparently based on Birks's fabricated palm print

identification, Defendant Hemmert decided to arrest Clemente and charge him with two counts of premeditated first-degree murder carrying a potential death penalty.

### September 20, 2004

70.     On September 20, 2004, crime lab analyst Scott Henderson submitted a blood stain pattern analysis report.  The analysis determined that Clemente's socks, shirt and shorts had contact bloodstains, which were consistent with Clemente holding Cheryl Williams after finding her already dead. His socks had "dropped bloodstains," which were consistent with his having picked her up, just as he described to investigators.  There were no medium velocity blood spatters consistent with stabbing someone 129 times anywhere on his clothing.

### October 8, 2004

71.     On October 8, 2004, crime lab analyst Catherine Mediaas submitted a DNA report.  It found that DNA matching Cheryl Williams was found on swabs from Clemente's socks, shoes, t-shirt, shorts and boxer briefs.  This was consistent with Clemente holding Cheryl Williams and picking her up, just as he described to investigators.  DNA from a swab of the palm print on the handle of the knife matched Cheryl Williams, not Clemente.

### THE INVESTIGATION WAS INTENTIONALLY AND/OR RECKLESSLY INADEQUATE

#### A.   Hemmert Failed To Investigate Van Sandt's and Samantha's Stories

72.     When Van Sandt was interviewed by Hemmert on June 17, 2004, he reported that after leaving the trailer together at around 11:30 pm the night before, he and Samantha had gone directly to his parents' house.

73.     However, when Defendant Hemmert asked Samantha where they went after leaving her mother's house, a simple question, an audio recording reveals a long pause (27

seconds) before Samantha responds – although this interview was only a few hours later.  This

was a red flag.

74.     Moreover, when she finally answered, Samantha lied about where they went

after leaving her trailer. She claimed that she and Van Sandt first went to Phil Keidaish's house,

where Van Sandt had been staying for the past several months.  Suspicious, Defendant Hemmert

told Samantha, "I didn't start doing this job just yesterday . . . We're going to figure out what

happened, regardless of who's responsible, I can guarantee you that."  She then admitted they

had gone to Van Sandt's parents' house.  When Hemmert asked her "why was that such a

difficult question," Samantha responded with a non sequitur, "It wasn't. His parents don't like

me."

75.     Despite Samantha's initial attempt to avoid admitting she had gone to Van

Sandt's parents' house the night before, Hemmert did not follow up on her lie by going to the

house to check for any incriminating evidence she might have been trying to hide.

76.     Moreover, when Van Sandt's mother was interviewed that same day, the SCSO

was unable to determine a time when Van Sandt and Samantha had allegedly arrived at the Van

Sandt residence, whether they arrived together or separately, or where Samantha was around

midnight.  In fact, his mother could not confirm whether Samantha was still at their house that

morning.

77.     This lack of corroboration made it even more imperative to investigate why

Samantha initially lied about going to the Van Sandt house.  But defendant Hemmert did not do

that. There is no indication in his report that he even went to the Van Sandt house, let alone

searched the room where Mark and Samantha had allegedly stayed in the house or searched the

bathroom they used. There is no indication that he took any pictures or checked for blood on any

clothes, towels or sheets at Van Sandt's parents' house.  There is no indication that defendant Grossi or any other SCSO crime scene investigator searched for any evidence at all at the Van Sandt residence.

78.     Any reasonable police officer or investigator in 2004 would have taken these basic, fundamental investigative steps to follow-up on evidence at the Van Sandt home, especially in light of the fact that Samantha and Van Sandt were the last people who admitted to seeing Cheryl and Carol alive, that Samantha and Cheryl had engaged in an argument the night before the bodies were found, and that Hemmert knew from Van Sandt that Samantha had mental health issues, had been diagnosed with Intermittent Explosive Disorder, and had previously been involuntarily committed to a mental hospital multiple times.

79.     Defendant Hemmert failed to investigate another discrepancy between Van Sandt's and Samantha's stories. Samantha told Hemmert that when Van Sandt did not return to his house that morning, she kept calling him on his cell phone but could not reach him *because his phone was beside the bed in the room where he and Samantha had been sleeping* at the Van Sandt residence.

80.     Hemmert knew, or reasonably should have known, this statement was another lie, because Van Sandt had used his cell phone to call 911 when he arrived at the Williams' house and found Cheryl dead inside. In fact, he told Hemmert he called 911 from his cell phone stating he called at "8:45, you can check my call history on . . . I called 911."  Despite this, Hemmert failed to follow-up on Samantha's lie by checking either Van Sandt's or Samantha's phone records and then confronting either of them.

81.     Defendant Hemmert failed to take any steps to investigate Samantha's story. Besides not getting Van Sandt's cell phone records to see if Samantha really did call him on the

morning of June 17th as she claimed, he never checked to see if Van Sandt had received any calls from Samantha the night before.  If there were calls from the Williams' trailer or Samantha's cell phone to Van Sandt's cell phone at the time Samantha and Van Sandt claimed they were together, that would have called into question their entire story. It might have suggested that Van Sandt left the trailer without Samantha and that she was then alone in the trailer with her mother and grandmother. While Defendant Hemmert could have easily obtained Van Sandt's and Samantha's cell phone records, he failed to carry out this basic investigative task.

82.     Defendants Hemmert and Grossi also failed to corroborate another important part of Samantha and Van Sandt's stories: Van Sandt told Hemmert he had come to the Williams' trailer shortly before 9:00 a.m. on June 17 to pick up Samantha's clothes from the washing machine. But Defendants Hemmert and Grossi never checked the washing machine to see if Samantha's wet clothes were in there. The investigation went on for eight days after the bodies were found. Defendants Hemmert and Grossi were at the scene of the crime multiple times over about a week before the scene was released, but never opened the washing machine to corroborate Samantha and Van Sandt's stories.

83.     If no wet clothes had been found in the washing machine, it would have seriously called into question the story told by Van Sandt and Samantha. If clothes *were* found in the washing machine and were still damp, they could have been tested for blood and would have shed light on whether the clothes were washed in an effort to clean up after the murders.

84.     Hemmert and Grossi failed to conduct even a minimally competent investigation of Van Sandt's and Samantha's stories.

B. **Hemmert and Grossi Failed to Photograph Samantha Williams on June 17, 2004**

85.     Hemmert and Grossi also failed to take any photographs of Samantha Williams'

hands or arms, despite knowing that she got into a fight with her mother the night before the bodies were discovered. Notably, Defendant Hemmert observed marks on Samantha's arm, yet failed to have any photographs taken of those marks.

86.     By way of contrast, Mr. Aguirre was thoroughly examined and photographed. Investigators took pictures of his hands, fingers, and arms. Investigators had him remove his shirt so they could photograph his torso and back. Investigators collected his shoes and clothing. Mr. Aguirre even consented to police taking buccal swabs and fingernail scrapings.  Defendants Hemmert's and Grossi's failure to investigate and document the marks on Samantha is another example of their failure to follow even basic investigatory protocols.

## C.  Hemmert and Grossi Failed To Test Critical Evidence Collected From the Scene

87.     Over the course of nearly a week, from June 17, 2004 until June 24, 2004, SCSO crime scene analysts Grossi, Craig, and Ohlson collected eighty-nine pieces of physical evidence, 150 blood samples, and sixty-seven bloody shoe prints from the crime scene at 121 Vagabond Way.

88.      Defendant Crime Scene Analyst Jacqueline Grossi, who was the lead CSA, spent a total of eight days processing the crime scene and collecting blood evidence.

89.     Defendants Hemmert and Grossi met during that time to determine what evidence should be collected and tested.  They did not turn over their notes from their meeting(s) to the Seminole County State's Attorney's Office.

90.     Defendants Hemmert's and Grossi's failure to collect and/or test evidence included, but was not limited to, the following:

   a.    Samantha's DNA was never collected and therefore never tested;

   b.    a third DNA profile on the Sysco knife, the murder weapon, was never tested;

    c.    blood drops on the door frame at the crime scene were never tested;

    d.    only Mr. Aguirre's buccal swabs were sent for testing;

    e.    swabs of blood found on the mirror in Samantha's bathroom were submitted into evidence but never tested;

    f.    none of the swabs collected from the concrete or carpet of the entry way where Cheryl Williams's body was found were tested;

    g.    the bloody doorknob from the entry way collected by CSA John Ohlson was never swabbed or processed for DNA. In fact, once the doorknob was collected, CSA Christine Craig never saw it again;

    h.    none of the items collected and packaged from the area inside the front door near Cheryl Williams's body were sent for testing;

    i.    only swabs from Mr. Aguirre's shoes were sent for testing;

    j.    a third DNA profile that did not match Mr. Aguirre, Cheryl Williams or Carol Bareis was never investigated;

    k.    Although CSA Craig stated she observed cuts on Van Sandt's right hand and lower leg, these areas were never swabbed;

    l.    swabs taken from the bottom of Van Sandt's feet were never sent for testing;

    m.    palm prints from Van Sandt were never taken for comparison; and

    n.    of the 26 partial footwear prints at the scene of the crime, 18 of them were not made by Mr. Aguirre or any Deputy at the scene. These footwear prints were never investigated further.

    o.    Samantha's shoes were never collected or tested for comparison to the 18 prints not made by Clemente.

91.    Despite the evidence collected by Defendant Hemmert that established that Clemente was at Pretzels at the time Cheryl and Carol were likely killed, and the indications that Samantha was the primary suspect in the murder of her mother and grandmother, Hemmert and Grossi decided not to test a single drop of blood from the 150 blood samples collected from the crime scene.

92.    Hemmert and Grossi recklessly or intentionally failed to have the evidence

collected from the crime scene at 121 Vagabond Way tested for DNA.  If Defendants Hemmert
and Grossi had tested the evidence collected from the Williams' trailer for DNA, they would
have learned that *none* of Mr. Aguirre's DNA was at the crime scene.

93.    If Defendants Hemmert and Grossi had tested the 150 blood samples collected
from the Williams' trailer for DNA, they would have discovered that there were eight deposits of
Samantha's blood in key locations. For example, one swab of blood taken from the kitchen, in an
area with other blood drops identified as belonging to both victims, contained Samantha's DNA.
Another swab of blood taken from the southeast living room, in an area with blood drops
identified as belonging to Cheryl Williams, also contained Samantha's DNA. The southwest
bedroom was Samantha's bedroom and contained a small half bathroom -- Samantha's DNA was
in blood swabs taken from that bathroom floor. Additionally, blood belonging to Cheryl was
found in that bathroom on a Nicoderm pack that Samantha told the police she had purchased on
the evening before the bodies were discovered.

94.    If Defendants Hemmert and Grossi had tested the 150 blood samples collected
from the Williams trailer for DNA, they also would have discovered Cheryl Williams's blood
outside of Samantha's bedroom window – a window Defendants knew or reasonably should
have known Samantha had a habit of climbing out of prior to the murders.

95.    If Defendants Hemmert and Grossi had tested the 150 blood samples collected
from the Williams trailer for DNA, they would have found that a third DNA profile not matching
Clemente Aguirre or the victims was located in multiple spots at the crime scene in the southeast
living room and the kitchen floor, and on the tip of the knife used in the murders.

96.    Instead of having the over 150 blood samples that Defendants collected tested,
the samples sat in the evidence room for eight years.

97.     If defendants Hemmert and Grossi had followed basic and fundamental investigation techniques, they would have discovered that none of the blood at the crime scene belonged to Clemente, and that blood found at the crime scene, including in the bathroom where the state argued Clemente had "cleaned up" after the murders, in fact belonged to Samantha, who had a history of mental illness and violence, including violence against her mother, had threatened her mother's life and had a motive to kill her.

98.     Had these facts been known to Clemente, he would have been able to demonstrate to the jury that he was innocent or, at the very least, would have created reasonable doubt at as to his guilt.

99.     If Defendants Hemmert and Grossi had followed basic and fundamental investigation techniques, and credited the evidence indicating that Clemente was at Pretzels at the time Cheryl and Carol were likely killed, Samantha Williams would have emerged as the primary suspect rather than Clemente.

100.    Defendants Hemmert's and Grossi's failure to adequately test the evidence collected from the crime scene severely prejudiced Mr. Aguirre at his capital murder trial.

101.    Defendants' failure to have the crime scene blood evidence tested was not the result of innocent or negligent mistakes.  It was not accidental. This was an intentional and deliberate decision of Defendants Grossi and Hemmert.

102.    Defendants Grossi and Hemmert, based on their confirmation (and perhaps ethnic) bias, made the decision to test only items that would tend to inculpate Clemente in the murders, such as the clothes and shoes he wore when he came into contact with the victims after finding them dead on June 17, 2004.  Since they knew Clemente had no cuts on June 17, 2004, and therefore had not bleed at the scene, they did not test any of the blood swabs collected, since

these would tend to exculpate him – and which in fact showed that Samantha had bled at the scene.

103.     This egregious failure to test the blood evidence collected from the crime scene is particularly disturbing in light of the evidence establishing that Clemente was likely at Pretzels at the time the victims were murdered, and the evidence pointing to Samantha as the most likely suspect in a murder scene indicating an emotional attachment between the victims and the perpetrator.  Indeed, in cases such as this one, when there is a violent attack in which the victim is stabbed multiple times, the assailant often cuts him or herself and bleeds.  Despite that, Defendants Grossi and Hemmert intentionally decided not to send the blood samples from the crime scene for testing – even though Grossi has admitted under oath that one of the reasons she collected the blood was to identify the perpetrator.

### D.   Defendants Hemmert, Grossi and Birks Failed to Follow Fundamental Investigative Procedures

104.     If Defendants Hemmert and Grossi had followed basic and fundamental investigation techniques, they also would have searched Van Sandt's parents' home to see if there was blood in his bedroom, on his sheets, on discarded clothing in his room, and elsewhere at his parents' home.  They did not do so.

105.     If Defendants Hemmert and Grossi had followed basic and fundamental investigation techniques, they would have compared the footprints found at the scene to the shoes worn by Samantha and Van Sandt on June 16, 2004. Instead, of the sixty-seven footprints collected from the crime scene at 121 Vagabond Way, sixty-four impressions were compared to only Mr. Aguirre's shoes and none of the other possible suspects.

106.     If Defendant Birks had followed basic and fundamental fingerprint comparison techniques, she would not have linked Clemente Aguirre to the murder weapon.  Instead,

Defendant Birks fabricated an identification of a partial palm print on the handle of the knife used in the murders as allegedly belonging to Clemente. This identification was totally false. No print suitable for identification had been found on the knife handle.

### E. Defendants Hemmert and Grossi Ignored the Forensic Evidence Regarding Time of Death and Failed to Fully Investigate Mr. Aguirre's Alibi

107.    Mr. Aguirre vehemently asserted his innocence to law enforcement during every step of the investigation. Defendants Hemmert and Grossi knew, or reasonably should have known, that the stiff condition of the bodies at 9:00 am indicated the victims had been killed hours before that, between 9:00 pm and 1:00 am. They also knew, or reasonably should have known, that a number of witnesses had confirmed Clemente's alibi that he was at Pretzels and then with other people at a trailer on Alma Avenue until at least 4:00 am. Clemente could not have killed the victims at least 8 hours before their bodies were found by the police to be stiff at 9:00 am.

108.    Despite this, Defendant Hemmert failed to follow up on Mr. Aguirre's asserted innocence and his alibi by interviewing neutral third-party witnesses.

109.    Had Hemmert done this, he would have found that there was no evidence that Mr. Aguirre had any hatred or ill feelings towards the victims; the evidence, to the contrary, would have shown that Mr. Aguirre and his neighbors were on friendly, social terms, but that Samantha had a reputation for being violent and dishonest.

110.    For example, Monica George was a part owner of Pretzels at the time of the murders, and Jamie Bernard was a bartender there. Samantha had worked at Pretzels until she was fired, and Clemente told the police on June 17, 2004 that he was at Pretzels until the early morning hours of June 17th. Despite this, no police officer interviewed them about their knowledge of Mr. Aguirre's whereabouts on the night of the murder or the nature of Samantha

and Cheryl's relationship.  This was a violation of basic investigatory procedures that were well-established in 2004.

111.    Had Hemmert interviewed Monica George in June 2004, he would have learned that she knew Clemente as a customer and knew that the Pretzels' staff considered him a person who was "well liked and easygoing and very friendly." He would have also learned that she knew Samantha, both from Samantha's time working at Pretzels and as a customer, and had fired Samantha after six months for being dishonest and stealing tips from other waitresses.  Finally, he would have learned that Samantha had a reputation for dishonesty, and that in the six months leading up to the murders, Monica George had observed Samantha and Cheryl arguing.

112.    Had Hemmert interviewed Jamie Bernard in June 2004, he would have learned that Samantha hated her mother "because [Cheryl] made [Samantha] have sex with [Cheryl's] drug dealers."

113.    Had Hemmert gone to Pretzels to investigate Mr. Aguirre's whereabouts and his alibi the night before the bodies were discovered, he would have learned that not only was Aguirre well-liked and peaceful, he was a regular patron who happened to be at the bar the night of June 16th into the early morning hours of June 17th.

114.    Jamie Bernard testified at Mr. Aguirre's post-conviction evidentiary hearing that Mr. Aguirre was in the bar late that night, until 3:00 or 3:15 in the morning. Importantly, she testified that after she left the bar around 3:45 a.m. she went to her friend Peter Nompleggi's house, where she and another friend hung out on the front porch and listened to music until about 5 a.m. When sitting outside of Peter's house she had a clear view of the Williams's trailer. Ms. Bernard testified that she did not see anyone enter or leave the Williams trailer, hear any screaming or yelling, or see or hear any other signs of a struggle taking place.

**F.  Defendants Hemmert and Grossi Failed to Adequately Investigate the Source of the Murder Weapon**

115.    Another issue Defendant Hemmert failed to adequately investigate was the source of the knife that was used as the murder weapon. It was Samantha who denied that her family owned the murder weapon, a Sysco knife, which is a common kitchen knife. The knife was found with blood on it next to the fence separating the 121 Vagabond Way and the trailer that Clemente lived in.

116.    Sysco is a company that makes restaurant supplies and equipment and is the world's largest broad line food distributor. Sysco does not sell products directly to individual consumers. Rather, it supplies products, including knives, to restaurants, healthcare and educational facilities, hospitality businesses like hotels and inns, and wholesale to other companies that provide food service. Therefore, the knife used as the murder weapon had to have come from some outside source, perhaps a restaurant.

117.    While Defendant Hemmert attempted to link Mr. Aguirre to the Sysco knife by checking at the restaurants at which he had worked, he made no attempt to determine whether that particular Sysco knife had been used by any restaurants where Samantha or Cheryl had worked, or was in the Williams' trailer before the murders.

118.    Defendant Hemmert knew from his interview with Samantha that she worked at a Subway sandwich shop, yet he did nothing to determine whether Subway restaurants use Sysco knives. Before Samantha worked at Subway, she worked at a Wendy's and at Chamberlain's. There is no indication that Defendant Hemmert ever went to any of those places to find out what kind of knives they used.

119.    Cheryl Williams worked at Kathy's Wings and Subs. There is no indication that

Defendant Hemmert went there so see what kind of knives they used.

120.     Defendant Hemmert failed to take any reasonable investigative steps to determine whether Samantha or her mother ever took Sysco products or restaurant equipment from the places where they worked.

121.     Perhaps most troubling, however, is the fact that photographs taken from the crime scene show that there were Sysco boxes in the Williams' trailer. There is no indication that Defendants Hemmert or Grossi inspected the box to see if it contained Sysco products or items taken from the restaurants where they were employed.  Likewise, there is no indication that Hemmert or Grossi ever tried to determine where the box came from. Instead, they simply took Samantha's word that the murder weapon did not come from her trailer.

### G. Defendant Hemmert Failed to Investigate Samantha's History of Mental Illness and Associated Violence

122.     In SCSO Officer Bean's initial interview with Van Sandt on June 17, 2004, he told Bean that Samantha had Intermittent Explosive Disorder and had been involuntarily committed to psychiatric hospitals.

123.     Defendant Hemmert knew or reasonably should have known that Samantha had a history of mental illness and of not getting along with her mother.

124.     Between November 1995, when she was 12, and March 1999, when she was 16, Samantha had been reported by her mother to the SCSO to be missing.  Each time, the SCSO found and returned Samantha home.

125.     In May 2001, Samantha underwent a psychiatric evaluation for complaints of mood swings, depression, racing thoughts, and episodes of rage. At this time Samantha was diagnosed with Psychosis Not Otherwise Specified ("NOS"), Substance-Induced Psychosis, Bipolar Disorder, Intermittent Explosive Disorder, and substance abuse.

126.     In September 2001, Samantha was again diagnosed with Psychosis NOS, Intermittent Explosive Disorder and substance abuse.

127.     In fact, one of the officers who responded to Williams' trailer on June 17, 2004, SCSO Toranzo, had responded to a call to the same trailer sometime during September 2001.

128.     When SCSO Officer Toranzo responded to that September 2001 incident at approximately 2:32 am, Samantha was violent, out of control and banging her head against the wall.  Cheryl told Toranzo she was afraid she could not control Samantha's outbursts. Of note, Toranzo was also a responding and investigating officer in the murder investigation of Cheryl and Carol, and reported to Defendant Hemmert in that capacity.

129.     As a result of this incident, Samantha was involuntarily committed to South Seminole Hospital. According to the September 2001 records of the involuntary commitment, upon admission to the hospital, Samantha was hostile toward staff, who described her as spitting, screaming, and out of control. She had to be medicated. She was also banging her head so hard against the wall that she had a large knot on her forehead with two cuts.

130.     According to the notes of nurse Barbara Drango during that September hospitalization, at 4:15 a.m., Samantha was in a hospital bed with her mother Cheryl at her bedside. At 4:20 a.m. she continued to bang her head and yell. The nurse called security who restrained Samantha in bed. At 4:40 a.m. Samantha was spitting on the floor and at people, so the hospital staff placed a spit mask on her. At 4:45 a.m. she stated, *with Cheryl Williams at her bedside,* "I'm going to fucking kill you, I'll kill all of you when I get out." As of 6:05 a.m. she was still agitated and screaming and spitting. Not until 6:30 a.m. was she finally asleep.  She was transferred to the Psychiatric Unit later that day.

131.     The discharge papers from Samantha's September 2001 hospitalization show

that Samantha was diagnosed with Impulse Control Disorder, Bipolar Affective Disorder, Depressive Disorder, and Alcohol Dependence.

132.    In June 2002, Samantha was diagnosed with Intermittent Explosive Disorder, alcohol dependence, cannabis abuse, and substance abuse with borderline personality disorder.

133.    Shortly thereafter, Samantha was involuntarily committed to the hospital by the police for smashing the windows on her boyfriend's family's home.

134.    While Samantha was involuntarily committed in June 2002, she was determined to be a danger to others and was secluded from the rest of the patients. She was diagnosed with Bipolar Disorder, Intermittent Explosive Disorder, alcohol and cannabis abuse, and Borderline Personality Disorder.

135.    In April 2003, Deputy John Harper of the SCSO responded to an argument at 121 Vagabond Way between Samantha and her brother, Erik Bareis.  Cheryl Williams called the police because Samantha was throwing and breaking objects within the home.

136.    At this time, Samantha was an outpatient at the Seminole Community Mental Health Center, Inc. and was diagnosed with Intermittent Explosive Disorder, alcohol dependency, polysubstance abuse and strong Borderline Personality Disorder.

137.    Defendant Hemmert knew or reasonably should have known about Samantha's psychiatric history, her explosive rage, and the history of conflict and violence between her and her mother.

138.    Any reasonable law enforcement officer in Defendant Hemmert's position in 2004 would have understood that the involuntary commitment and examination of an individual, sometimes under restraint, is only permitted when the person poses a threat to herself and/or others.

139.     As a homicide investigator, Defendant Hemmert had access to law enforcement records about Samantha's criminal and commitment history that Clemente and his counsel could not access.  On information and belief, Defendant Hemmert intentionally and/or recklessly failed to turn over information in his possession and in the possession of the SCSO about Samantha's criminal and involuntary commitment history.

140.     Any reasonable law enforcement officer in 2004 would have known that the failure to turn over the exculpatory and impeachment evidence of Samantha's criminal and commitment history would violate Mr. Aguirre's right to a fair trial under the Due Process Clause of the Fourteenth Amendment.  In light of the fact that Samantha Williams became the State's Attorney's star witness, Defendant Hemmert clearly should have turned over this impeachment and exculpatory information about Williams to the State's Attorney.  No reasonable officer would have believed this conduct was lawful or compliant with Mr. Aguirre's right to a fair trial under the Due Process Clause of the Fourteenth Amendment.

141.     As the lead investigator on the case, it was Defendant Hemmert's obligation to turn over this material to the State's Attorney's Office.  This evidence constituted *Brady* material and Hemmert's intentional and/or reckless failure to turn it over to the State's Attorney's office violated Clemente's right to a fair trial.

142.     In addition, since Hemmert knew or reasonably should have known that Samantha had been involuntarily committed to psychiatric hospitals, Defendant Hemmert should have sought to obtain the hospital records relating to Samantha's involuntary commitments to learn more about the extent of Samantha's violent tendencies, and to provide this information to the State's Attorney.  However, Defendant Hemmert never took a single step to learn more about Samantha's diagnosis of Intermittent Explosive Disorder, nor did he seek to obtain the relevant

mental health records.

143.     Defendant Hemmert recklessly or intentionally made no attempt to conduct any reasonable investigation of Samantha Williams.  If he had conducted even a minimal investigation of Samantha's background, he would have discovered a long and concerning past. Coupled with the inconsistencies between her and Van Sandt on the night of the murders, her violent tendencies, her tumultuous relationship with her mother, and the time of death evidence based on the degree of rigor mortis, this history should have caused any reasonable homicide investigator in 2004 to conduct a further investigation of Samantha's involvement in the murders.

144.     Defendant Hemmert's failure to conduct even a minimal investigation into Samantha's June 17, 2004 story and her background was intentional and/or done in reckless disregard of his duty as a law enforcement officer, and violated Mr. Aguirre's constitutional right to a fair investigation and a fair trial.

### Mr. Aguirre's Death Penalty Trial

145.     Clemente Aguirre's capital murder trial began on February 20, 2006.

146.     During the trial, the Florida Assistant State's Attorney, James Carter, alleged that Mr. Aguirre entered the home on the morning with a knife with the intent to burglarize the residence and steal beer.

147.     Mr. Carter alleged that Mr. Aguirre murdered Carol Bareis and stabbed Cheryl Williams 129 times because he was afraid of being deported.

148.     In order to explain the blood on Samantha William's bed sheet and windowsill (that had not been tested for DNA), Mr. Carter argued that after the murders, Mr. Aguirre went into Samantha Williams's room to lay down on the bed and look out the window.  He further

claimed that Mr. Aguirre used a towel in the bathroom near Samantha's room to clean up, and exited the home through her window just as Mark Van Sandt arrived to the home. That towel had not been tested for DNA.

149.     The state's theory was not consistent with the fact that the bodies of the victims were already stiff at 9:00 am.

150.     In support of his theory, Mr. Carter relied on testimony from Samantha Williams that Mr. Aguirre had entered 121 Vagabond Way uninvited, around six to seven months prior to the murders, in the middle of the night to watch her sleep.

151.     Samantha Williams further testified that the murder weapon, a Sysco knife, had never been in the Williams' trailer prior to murders.

152.     On February 28, 2006, Mr. Aguirre was convicted on two counts of first-degree murder and one count of burglary with an assault or battery.

153.     On March 10, 2006, he was sentenced to death for both murders.

154.     Mr. Aguirre's conviction was based solely on circumstantial evidence.

155.     The circumstantial evidence that the State of Florida relied on to convict Mr. Aguirre included the following:

    a.  DNA on the knife blade that matched only Carol Bareis and Cheryl Williams;

    b.  DNA on the knife handle matching only Cheryl Williams;

    c.  the knife used in the murders was similar to those used at the restaurant where Mr. Aguirre and his roommates worked;

    d.  contact and splatter stains containing Carol Bareis and Cheryl William's DNA were found on Mr. Aguirre's shorts, socks, and T-shirt; and

    e.  footprints that allegedly belonged to Mr. Aguirre were found at the crime scene.

156.     During the State's case in chief, Defendant Birks testified that the latent palm print in Cheryl's blood found on the knife handle *matched* Mr. Aguirre.

157.    This testimony by defendant Birks was completely fabricated.  There was no latent palm print on the handle of the knife that was suitable for comparison.  She knew this at the time of the trial, but she never told the State's Attorney, so Mr. Aguirre's defense counsel was never informed, thereby causing a violation of Mr. Aguirre's constitutional right to a fair trial.

### The Acts and Omissions of Defendants Resulted From the Failure of the SCSO to Adequately Train and Supervise Its Officers

158.    Upon information and belief, prior to June 17, 2004, the SCSO did not adequately train or supervise its officers with regard to the facts and circumstances that should be considered "red flags" in evaluating a suspect or a witness.

159.    Upon information and belief, prior to June 17, 2004, the SCSO did not adequately train or supervise its officers with regard to the law enforcement practices and procedures that should be followed in conducting investigations involving a suspect or a witness with a history of mental health crises, arrests, threats of violence against one of the victims, and involuntary institutionalizations.

160.    Upon information and belief, prior to June 17, 2004, the SCSO did not adequately train or supervise its officers with regard to how to investigate or evaluate a suspect or a witness who has a history of mental health crises, arrests, threats of violence against one of the victims, and involuntary institutionalizations.

161.    Upon information and belief, prior to June 17, 2004, the SCSO did not adequately train or supervise its officers with regard to the need to document exculpatory and/or impeachment evidence learned during the course of an investigation.

162.    Upon information and belief, prior to June 17, 2004, the SCSO did not adequately train or supervise its officers with regard to the need to inform the Seminole County

State's Attorney of exculpatory and/or impeachment evidence in the possession or within the knowledge of the SCSO.

### Post-Conviction DNA Testing

163.    Mr. Aguirre's post-conviction counsel successfully won a motion to have the Seminole County Sheriff's Office send 84 items to the FDLE for DNA testing.

164.    The items sent for testing included swabs of blood collected throughout the crime scene by crime scene analysts. In the initial round of testing, two of the swabs contained blood that came from Samantha Williams.

165.    One swab was item number JG29-O collected from the kitchen in an area with other drops of blood belonging to the victims, Cheryl Williams and Carol Bareis.

166.    The second swab was item number JG26-D collected from the southeast living room in an area with other drops of blood belonging to Cheryl Williams.

167.    Most importantly, none of the 84 items that were tested revealed any blood or DNA belonging to Mr. Aguirre.

168.    Based on the results, Mr. Aguirre's post-conviction trial team successfully moved to have an additional 63 items sent to the FDLE for testing. As a result, Samantha Williams's blood was found in an additional six places at the crime scene.

169.    The report indicated that:

a. item number JG24 taken from the southwest bedroom bathroom floor was identified as blood belonging to Samantha;

b. blood belonging to Cheryl Williams was found in the bathroom attached to Samantha's bedroom on a Nicoderm CQ CD. Samantha told police that she just purchased the Nicoderm the evening before the murders;

c. blood belonging to Cheryl Williams was found on Samantha's bedroom floor and on the window in her bedroom;

d.  blood belonging to Carol was found on a white towel in Samantha's bedroom;

e.  item number JG38-C a swab taken from the southeast bathroom door that contained Samantha's blood. Cheryl's blood was also found on the bathroom floor where the Seminole County Sheriff's Office claimed Mr. Aguirre cleaned up after the murders; and

f.  item number JG33-C was a swab taken from the wall of the half bathroom in Samantha's bedroom and contained Samantha's blood. Cheryl's blood was also found in this bathroom and Cheryl and Carol's blood was found in Samantha's bedroom.

## **Post-Conviction Proceedings**

170.     After his conviction, the Florida Supreme Court affirmed the convictions and sentences on direct appeal. Additionally, the United States Supreme Court denied Mr. Aguirre's petition for writ of certiorari.

171.     In 2011, Mr. Aguirre filed his first post-conviction motion for claims of ineffective counsel and failure to investigate alternate suspects, including Samantha.

172.     Subsequently, Mr. Aguirre amended his post-conviction motion after DNA testing of multiple bloodstains from the crime scene that were found to contain the DNA of Samantha.

173.     Following the evidentiary hearing, the circuit court denied Mr. Aguirre's relief on all claims.

174.     In 2014, Mr. Aguirre appealed to the Florida Supreme Court. While his appeal was pending, Mr. Aguirre filed a successive post-conviction motion in the circuit court alleging that he was entitled to a new trial based on newly discovered evidence.

175.     The newly discovered evidence included affidavits stating that Samantha had told numerous individuals that she killed Cheryl Williams and Carol Bareis.

176.     The circuit court again denied Mr. Aguirre's motion. The circuit court ruled

that the statements regarding Samantha's confession were hearsay and inadmissible and even if admissible, this evidence would not have produced an acquittal.

177.     However, in October 2016, the Florida Supreme Court threw out Mr. Aguirre's conviction and granted him a new trial based on newly discovered evidence.  *See Aguirre-Jarquin v. State*, 202 So.3d 785 (Fla. 2016).

178.     On November 5, 2018, after nearly two years of waiting in jail and preparing for a new trial, the Seminole County State's Attorney dropped all charges against Mr. Aguirre while in the middle of jury selection.

## **Damages**

179.     At the time Mr. Aguirre was wrongfully accused of murdering Cheryl Williams and Carol Bareis, he was a 24-year-old man with his whole life ahead of him.

180.     In serving almost half of his life behind bars, Plaintiff was unjustly deprived of much of his adult life to date. He was stripped of the various pleasures of basic human experience, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, and other life events with loved ones.

181.     As a result of his wrongful conviction and incarceration, Plaintiff must now attempt to rebuild his life outside of prison, all without the benefit of the life experiences afforded to most adults.

182.     As a result of his wrongful conviction and incarceration, Plaintiff has suffered and continues to suffer extraordinary psychological harm.

## CAUSES OF ACTION

## COUNT I

### 42 U.S.C. § 1983 – Violation of Due Process

183.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

184.     As described in greater detail above, the Defendants, while acting individually and jointly  with one another, as well as under color of state law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

185.     As  described more fully above, the  Defendants deliberately, intentionally and/or recklessly withheld exculpatory and impeachment evidence from the Plaintiff and from the Seminole County State's Attorney, thereby misleading and misdirecting the criminal prosecution.

186.     In the manner described more fully above, Defendants intentionally or recklessly engaged in the fabrication of inculpatory evidence, and concealed the fabrication of inculpatory evidence from the State's Attorney and the defense.

187.     In the manner described more fully above, Defendants also engaged in unduly suggestive and outcome determinative investigative procedures.

188.     Absent the totality of the misconduct, the prosecution of the Plaintiff could not and would not have been pursued and his wrongful conviction would not have resulted.

189.     The Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

190.     As a direct and proximate result of this violation of his constitutional right to a

fair trial, Plaintiff suffered injuries, including but not limited to, loss of liberty and emotional

distress, as more described more fully above.

## COUNT II

### 42 U.S.C. § 1983 - Failure to Investigate

191.      Plaintiff hereby incorporates by reference all of the foregoing paragraphs and

further alleges as follows:

192.     Between June 17, 2004 and June 20, 2004, Defendants deliberately, intentionally

and/or recklessly failed to conduct any investigation of the alternative suspect Samantha

Williams.

193.     By June 17, 2004, the Defendants had made a decision to charge Mr. Aguirre

with evidence tampering.

194.     By June 25, 2004, the Defendants had made the decision to charge Mr. Aguirre

with two counts of first-degree murder.

195.     The Defendants deprived Mr. Aguirre of his clearly established constitutional

right to due process of law and a fair criminal proceeding by deliberately, intentionally and/or

recklessly failing to conduct any investigation of the alternative prime suspect Samantha

Williams.

196.     The Defendants caused the arrest and charging of Mr. Aguirre on June 25, 2004

without taking several basic, fundamental investigative steps.  Among other investigative

failures, Defendants failed to follow-up on blatant discrepancies between Samantha Williams'

and Mark Van Sandt's alibis, failed to test over 150 blood samples from the crime scene (which,

if done, would have showed that none of Aguirre's blood was found at the scene), failed to

investigate and search Mark Van Sandt's parents' home for evidence, failed to review phone

records for Mark and Samantha, and failed to photograph Samantha and the scratches and marks she sustained.  Any reasonable criminal investigator would have taken these steps.

197.    The Defendants failure to investigate the alternative prime suspect Samantha Williams directly and proximately caused Mr. Aguirre to be deprived of a fair trial under the Fourteenth Amendment of the United States Constitution.

## COUNT III

**42 U.S.C. §1983 Municipal Liability Against Seminole County for Deprivation of Constitutional Rights Under *Monell v. Department of Social Services of the City Of New York*, 436 U.S. 658 (1978)**
**(Failure to Enact Policies or Training Regarding Investigations)**
**(Against Seminole County)**

198.    Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

199.    The Seminole County Sheriff's Office was at all times relevant to this Complaint an entity controlled and funded by Seminole County.

200.    Upon information and belief, the Seminole County Sheriff was at all times relevant to this Complaint elected as Sheriff of Seminole County.

201.    Upon information and belief, Seminole County delegated the rules, procedures and training that applied to Seminole County Sheriff's officers employed by Seminole County Sheriff's Office to the Seminole County Sheriff.

202.    The Seminole County Sheriff, and his designees, had the power and responsibility to train and supervise officers and investigators, including defendants.

203.    The Seminole County Sheriff, and/or his designee, during the relevant time period was a final policymaker for Seminole County with regard to all investigative activities conducted by the Seminole County Sheriff's Office.

204.    The acts and omissions of the Seminole County Sheriff and/or his designee,

during that time constituted the policy, custom, or pattern and practice of Seminole County.

205.    Before and during the prosecution of Mr. Aguirre, the Seminole County, by and through its final policymaker(s), with deliberate indifference, (a) failed to enact any policies or procedures that SCSO officers were required to follow in conducting investigations involving a suspect or a witness who has a history of mental health crises, arrests, threats of violence against one of the victims, and involuntary institutionalizations under the Baker Act, and (b) maintained a policy, custom, or pattern and practice of failing to adequately train and supervise SCSO officers in connection with its investigations.

206.    It would have been plainly obvious to a reasonable policymaker that (a) failing to enact any policies or procedures that officers and investigators were required to follow in conducting investigations involving a suspect or a witness who has a history of mental health crises, arrests, threats of violence against one of the victims, and involuntary institutionalizations under the Baker Act and (b) failing to adequately train and supervise SCSO officers and investigators, in connection with conducting investigations, would lead to deprivations of suspects' constitutional rights.

207.    The Seminole County Sheriff and/or his designee knew or reasonably should have known that SCSO had no policies or procedures that officers, including but not limited to defendants, were required to follow in conducting investigations or evaluations of a suspect or a witness who has a history of mental health crises, arrests, threats of violence against one of the victims, and involuntary institutionalizations under the Baker Act.

208.    The Seminole County Sheriff and/or his designee knew or reasonably should have known that officers and investigators, including but not limited to defendants, had not been adequately or properly trained with regard to conducting investigations of a suspect or a witness

who has a history of mental health crises, arrests, threats of violence against one of the victims, and involuntary institutionalizations under the Baker Act.

209.     The Seminole County Sheriff and/or his designee, knew or reasonably should have known that there had been a failure to adopt policies and procedures or to adequately train and supervise officers and investigators, including but not limited to defendants, with regard to how to investigate and evaluate contradictions in witness statements, especially those involving a suspect or a witness who has a history of mental health crises, arrests, threats of violence against one of the victims, and involuntary institutionalizations under the Baker Act.

210.     The Seminole County Sheriff and/or his designee, knew or reasonably should have known that there had been a failure to adopt policies and procedures or to adequately train and supervise officers and investigators, including but not limited to defendants, with regard to how to investigate and evaluate contradictions in witness statements, especially those involving a suspect or a witness who has a history of mental health crises, arrests, threats of violence against one of the victims, and involuntary institutionalizations under the Baker Act.

211.     The Seminole County Sheriff and/or his designee knew or reasonably should have known that officers and investigators, including but not limited to defendants, were engaging in a pattern and practice of failing to investigate and evaluate suspects with a history of mental health crises, arrests, threats of violence against one of the victims, and involuntary institutionalizations under the Baker Act.

212.     The Seminole County Sheriff and/or his designee knew or reasonably should have known that officers and investigators, including but not limited to defendants, were engaging in a pattern and practice of failing to properly investigate and evaluate contradictions in witness statements, especially those involving a suspect or a witness who has a history of mental

42

health crises, arrests, threats of violence against one of the victims, and involuntary institutionalizations under the Baker Act.

213.    The Seminole County Sheriff and/or his designee, knew or reasonably should have known that SCSO officers and investigators, including but not limited to defendants, were systematically disregarding proper and accepted law enforcement practices and procedures with regard to the investigation of contradictions in witness statements, especially those involving a suspect or a witness who has a history of mental health crises, arrests, threats of violence against one of the victims, and involuntary institutionalizations under the Baker Act.

214.    The Seminole County Sheriff and/or his designee, agreed to, approved, condoned, and/or ratified the SCSO's policy and custom of failing to enact policies or procedures or to adequately and properly train officers and investigators with regard to how to investigate and evaluate a suspect or a witness who has a history of mental health crises, arrests, threats of violence against one of the victims, and involuntary institutionalizations under the Baker Act.

215.    The Seminole County Sheriff and/or his designee, created, promulgated and maintained, with deliberate indifference, a policy, custom, and/or pattern and practices which deprived Mr. Aguirre of his constitutional rights not to be deprived of his liberty without due process and to a fair trial.

216.    No reasonable policymaker would have agreed to, approved, condoned, and/or ratified the Seminole County Sheriff's policy and custom of failing to enact policies or procedures or to properly and adequately train officers and investigators working on a case involving a suspect or a witness who has a history of mental health crises, arrests, threats of violence against one of the victims, and involuntary institutionalizations under the Baker Act.

217.     Any reasonable policymaker would have known that such a policy or custom would lead to deprivations of the constitutional rights of criminal suspects.

218.     The policies and customs agreed to, approved, condoned, and/or ratified by the Seminole County Sheriff and/or his designee, caused the improper and unconstitutional conduct engaged in by defendants in the investigation and prosecution of Mr. Aguirre.

219.     The wrongful acts and omissions that caused Mr. Aguirre's wrongful conviction and incarceration were carried out pursuant to the Seminole County defendant's policies, customs, patterns or practices.

220.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Seminole County Sheriff's Office to pursue wrongful convictions through profoundly flawed investigations and to deliberately, intentionally and/or recklessly fail to disclose exculpatory and impeachment evidence bearing on the crime at issue. Seminole County violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

221.     In addition to constituting policies, these widespread practices, so well-settled as to constitute de facto policy in the Seminole County Sheriff's Office, were able to exist and thrive because municipal policy makers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

222.     The widespread practices described in the preceding paragraphs were allowed to flourish because Seminole County declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment. Indeed, the Seminole County Sheriff's Office's system for investigating and disciplining police officers accused of this type of misconduct was, and is, for all practical purposes, nonexistent. As a result, officers are led to

believe they can act with impunity, thereby encouraging the very type of abuses that Plaintiff experienced.

223.    The county policies, customs or patterns and practices of Seminole County proximately and directly caused Mr. Aguirre's wrongful conviction and incarceration.

224.    Defendant Seminole County is liable for the deprivation of Mr. Aguirre's constitutional rights caused by the policies, practices and customs agreed to, approved, condoned, and/or ratified by the Seminole County Sheriff as described above.

225.    As a direct and proximate result of the above-described wrongful conduct of defendant Seminole County, Mr. Aguirre suffered physical injury, emotional injury, emotional trauma, and loss of liberty in each year from 2004 through 2018, as well as other damages to be determined at the trial of this matter.

## COUNT IV

**42 U.S.C. § 1983 Liability Against Seminole County for Deprivation of Constitutional Rights Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978)**
**(Failure to Enact Policies or Training regarding Exculpatory Evidence)**
**(Against Seminole County)**

226.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

227.    Before and during the prosecution of Mr. Aguirre, Seminole County, by and through its final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of (a) failing to adopt policies and procedures requiring SCSO officers and agents to document exculpatory and impeachment information, and to provide such information to the Seminole County State's Attorney's office, and (b) by failing to adequately train and supervise SCSO officers and agents regarding the need to document exculpatory and impeachment information, and to provide such information to the Seminole County State's

Attorney's office.

228.     It would have been plainly obvious to a reasonable policymaker that failing to adopt policies and procedures, and failing to adequately train and supervise SCSO investigators, officers, and agents, regarding the need to document exculpatory and impeachment information, and to provide such information to the Seminole County State's Attorney's office, would lead to deprivations of suspects' constitutional rights.

229.     The Seminole County Sheriff and/or his designees knew or reasonably should have known that there had been a failure to adopt policies and procedures and to adequately train and supervise felony investigators, including but not limited to Defendants Hemmert, Grossi, and Birks, as well as  other unknown SCSO officers with regard to the necessity of fully and completely documenting all exculpatory and impeachment material and providing all such material to the Seminole County State's Attorney's office.

230.     The Seminole County Sheriff and/or his designees agreed to, approved, condoned, and/or ratified the SCSO's policy and custom of failing to enact policies and procedures, and failing to adequately train SCSO officers, with regard to the necessity of fully and completely documenting all exculpatory and impeachment material, and of providing such material to the Seminole County State's Attorney's office, and was deliberately indifferent to this policy and custom.

231.     The Seminole County Sheriff and his designees, failed to ensure that SCSO officers, including Defendants, documented and disclosed all exculpatory and impeachment evidence discovered during their investigation to the Seminole County State's Attorney's office so that such information would be disclosed to defense counsel, including but not limited to counsel for Mr. Aguirre, as required by law.

232.     The failure of the Seminole County Sheriff, and his designees, to train or supervise SCSO officers, including Defendants, with regard to documenting and providing all exculpatory and impeachment evidence to the Seminole County State's Attorney's office amounted to gross indifference and/or intentional misconduct and directly caused the violations of Mr. Aguirre's constitutional rights and his wrongful 14-year imprisonment.

233.     The Seminole County Sheriff, and his designees, were deliberately and recklessly indifferent to criminal defendants', including Mr. Aguirre's clearly established rights under the Fourteenth Amendment of the United States Constitution to due process of law and a fair trial.

234.     The Seminole County Sheriff, and/or his designees, created, promulgated, and maintained, with deliberate indifference, policies, customs, and/or practices which violated Mr. Aguirre's constitutional rights not to be deprived of his liberty without due process and a fair trial.

235.      No reasonable policymaker would have agreed to, approved, condoned, and/or ratified the SCSO's policy and custom of failing to enact policies and procedures, and failing to properly train SCSO officers, with regard to the necessity of fully and completely documenting all exculpatory and impeachment material, and of providing all such material to the Seminole County State's Attorney's office as described above.

236.     Any reasonable policymaker would have known that such policies or customs would lead to deprivations of the well-established constitutional rights of criminal suspects.

237.     The policies and customs agreed to, approved, condoned, and/or ratified by the Seminole County Sheriff and/or his designee caused the improper and unconstitutional conduct engaged in by Defendants in the investigation and prosecution of Mr. Aguirre.

238.     The wrongful acts and omissions that caused Mr. Aguirre's wrongful conviction and incarceration were carried out pursuant to Seminole County's policies, customs, patterns or practices.

239.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Seminole County Sheriff's Office to pursue wrongful convictions through profoundly flawed investigations and to deliberately, intentionally and/or recklessly fail to disclose exculpatory and impeachment evidence bearing on the crime at issue. Seminole County violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

240.     In addition to constituting policies, these widespread practices, so well-settled as to constitute de facto policy in the Seminole County Sheriff's Office, were able to exist and thrive because municipal policy makers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

241.     The widespread practices described in the preceding paragraphs were allowed to flourish because Seminole County declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment. Indeed, the Seminole County Sheriff's Office's system for investigating and disciplining police officers accused of this type of misconduct was, and is, for all practical purposes, nonexistent. As a result, officers are led to believe they can act with impunity, thereby encouraging the very type of abuses that Plaintiff experienced.

242.     The county policies, customs or patterns and practices of Seminole County proximately and directly caused Mr. Aguirre's wrongful conviction and incarceration.

243.     Defendant Seminole County is liable for the deprivation of Mr. Aguirre's

constitutional rights caused by the policies, practices and customs agreed to, approved, condoned, and/or ratified by the Seminole County Sheriff as described above.

244.     As a direct and proximate result of the above described wrongful conduct of Defendant Seminole County, Mr. Aguirre suffered loss of liberty and emotional trauma in each year from 2004 through 2018, as well as other damages to be determined at trial.

## COUNT V

### State Law Claim – Intentional Infliction of Emotional Distress

245.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

246.     The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

247.     As a direct and proximate result of the Defendants' actions, Plaintiff suffered loss of liberty and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT VI

### State Law Claim – *Respondeat Superior*

248.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

249.     While committing the misconduct alleged in the preceding paragraphs, Defendants were employees, members, and/ or agents of Seminole County or the Florida Department of Law Enforcement, acting at all relevant times within the scope of their employment.

250.    Defendant Seminole County is liable as principal for all torts committed by its agents.

## PRAYER FOR RELIEF

251.    WHEREFORE, Plaintiff Clemente Javier Aguirre-Jarquin respectfully requests that the Court enter judgment in his favor and against defendants on all counts of the complaint, and award relief as follows:

252.    Compensatory damages against the defendants, jointly and severally, in an amount to be determined at trial;

253.    Punitive damages against the individual defendants for their conduct in an amount to be determined at trial, in order that such award will deter similar prohibited behavior by defendants and other law enforcement officers in the future;

254.    Pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. §1988 and 42 U.S.C. §1920, against defendants, jointly and severally; and

255.    Any and all other relief to which he may be entitled.

Respectfully submitted this 7th day of January, 2020.


s/ Joshua Dubin
Plaintiff's Attorney

Joshua Dubin, P.A.
201 S. Biscayne Blvd.
Suite 1210
Miami, Florida 33131
Fl. Bar Number: 48865

David Rudolf
Rudolf Widenhouse
225 East Worthington Avenue
Suite 200
Charlotte, NC 28203
(704) 333-9945
dsrudolf@rudolfwidenhouse.com

Karyn L. Bass Ehler
Grant & Eisenhofer
30 N. LaSalle St., Suite 2350
Chicago, IL 60602
312-610-5350
kbassehler@gelaw.com

*Attorneys for Plaintiff Clemente Javier*
*Aguirre-Jarquin*