## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CLEMENTE JAVIER AGUIRRE-
JARQUIN,

      Plaintiff,

v.                                                   Case No. 6:20-cv-25-RBD-DCI

ROBERT HEMMERT; JACQUELINE
GROSSI; DONNA BIRKS; and
DENNIS LEMMA,

      Defendants.

_____

## ORDER

Before the Court are Defendant Donna Birks' motion for summary judgment (Doc. 185); Defendants Robert Hemmert, Jacqueline Grossi, and Dennis Lemma's joint motion for summary judgment (Doc. 236); all parties' *Daubert* motions (Docs. 181–84); and Plaintiff's motion to amend (Doc. 263).

## INTRODUCTION

Nearly two decades ago, Clemente Javier Aguirre-Jarquin was arrested for the murders of his neighbors, Cheryl Williams and her elderly mother Carol Bareis. From a certain viewpoint, it seemed like an open-and-shut case. Cheryl's daughter, Samantha Williams, pointed the finger at Aguirre, an undocumented immigrant who had previously entered their house in the middle

of the night. They found bloody clothes in his house and his palm print on the murder weapon. He was tried, convicted, and sentenced to death.

But that open-and-shut case unraveled during the decade Aguirre spent on death row. The examiner who matched Aguirre's print to the murder weapon resigned in disgrace after an investigation concluded she was incompetent. Blood from the crime scene that had never been tested implicated Samantha, not Aguirre. And Samantha, who had anger and mental health issues, confessed that she was the one who killed her mother and grandmother. After all this, the Florida Supreme Court vacated Aguirre's conviction.

With some perspective, the case that once looked open-and-shut now looks more like a predetermined destination searching for a route. From the viewpoint of Aguirre's best facts, this case appears to be less about what did happen and more about what did not: a detective who did not see the many red flags pointing to Samantha, an inexperienced crime scene analyst who did not test any blood from the house where the murders took place, and a print examiner who reported a match when the science did not support one. This is a case about leads dropped, inconsistencies ignored, doubts glossed over—and a man who spent ten years waiting to be executed because the legal process went wrong.

# BACKGROUND[1]

In the early 2000s, Plaintiff Clemente Javier Aguirre-Jarquin ("Aguirre") was a young undocumented immigrant who fled Honduras to escape gang violence. He came to Altamonte Springs to be near his sister and got a job at a restaurant. Two of his coworkers lived in a nearby trailer park; he moved into a shed on their property about a year before the murders. (Doc. 187, pp. 21:1–2, 21:21–22, 22:8–15, 23:20–24:2, 27:12–17, 29:9–10, 29:25–30:2, 98:22–24, 99:2–5, 108:23–24.)

Three women lived in the trailer opposite Aguirre and his roommates: Samantha Williams ("Williams"), her mother Cheryl Williams ("Cheryl"), and her grandmother Carol Bareis ("Carol"). Aguirre quickly became friendly with them and visited their trailer many times in the year since he moved in; he often drank with the Williamses and they always had beer for him. A few times, Aguirre got drunk and entered their trailer during the night without knocking. Williams and her mother discouraged this because of Williams' aggressive dog. (*Id.* at 64:9–16, 65:1–25, 67:4–7.)

At the time of the murders, Williams and Aguirre were around the same age, their early twenties. Williams had a history of anger and mental health

---

[1] The facts recited here may not be the actual facts but reflect Aguirre's best case as the nonmovant. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).

problems. She was diagnosed with intermittent explosive disorder, an anger and aggression-based disorder, and prone to violence. Her mother had her committed under the Baker Act, and they had a history of arguing. Williams worked at a restaurant. Her boyfriend, Mark Van Sandt, was a sex offender on probation. (Doc. 187, p. 142:14–18; Doc. 193, pp. 149:4–19, 225:14–15, 238:17–18, 319:18–320:21, 324:9–22, 335:2–5; Doc. 236-14, pp. 2, 20.)

The evening of June 16, 2004, Van Sandt visited Williams at the trailer. The couple made drinks and spilled ice on the floor. Williams and her mother argued over the ice. Williams was trying to quit smoking and was on edge. Around 10:00 p.m., after the argument, Cheryl dropped in on her neighbors Diane Schroyer and Mike Weaver. Cheryl told Schroyer about the argument and complained about Williams for a while, then went back to her own trailer around 11:00 p.m. Van Sandt and Williams supposedly left soon after and went to Van Sandt's parents' house to spend the night. (Doc. 193, pp. 144:2–146:20, 276:18–22; Doc. 236-12, p. 2; Doc. 236-14, pp. 3, 6, 11, 13.)

Meanwhile, Aguirre had the night off work. He drank, hung out with friends, and went to a bar to play pool, staying until around 2:00 or 3:00 a.m. He then went to a friend's house before returning home sometime between 4:00 and 6:00 a.m. (Doc. 187, pp. 32:2–5, 50:1–6, 56:1–7, 58:12–15, 60:13–20; Doc. 236-12, pp. 2–3.)

When Aguirre got back from his friend's house early that morning of June 17, he went over to the Williams trailer to see if they had any beer, as he often did. He knocked as he had been told. The door, which was habitually unlocked, opened partially—but it was stuck. Shoving it ajar, he saw Cheryl's dead body blocking the door. She had been stabbed many times and blood was everywhere. He pushed inside to see if she was alive so he could help. But he did not call 911 because he feared being deported. (Doc. 187, pp. 69:11–70:11, 71:10–23, 72:3–14.)

Once inside, Aguirre felt Cheryl's body for a pulse but could not find one, getting her blood on his clothes in the process. By this time, Cheryl's body was cold and stiff. He saw a knife lying nearby. After calling out, he walked further into the house and found Carol's dead body in the next room. He thought he heard a noise, so he grabbed the knife with his right hand to defend himself.[2] He checked the rest of the trailer but, finding no one, ran back home and threw the knife down along the way. Too frightened to call the police, he took off his bloody clothes, put them in a bag, hid them on the roof, and showered. (*Id.* at 74:15–21, 77:10–24–78:6, 83:20–25, 87:21–25, 88:21–93:17, 95:3–6, 96:3–4, 97:1–3, 99:8–100:5, 102:10.)

A few hours later, around 9:00 a.m., Van Sandt arrived back at the Williams trailer to pick up Williams' work clothes. But Williams was not with him; she was still at his parents' house sleeping. The front door was unlocked as usual. The door

---

[2] Aguirre is right-handed.

seemed blocked, but he pushed it open—hitting Cheryl's dead body. He then called 911. While on the call, he touched Cheryl's body, finding it cold and stiff. He stepped in Cheryl's blood with his bare feet[3] and found it sticky, on its way to drying. (Doc. 193, p. 99:24–25; Doc. 193-1; Doc. 236-12, p. 3; Doc. 236-14, p. 16.)

Police were already nearby and arrived a few minutes after Van Sandt called 911. Not wanting to disturb Cheryl's body further, they went into the trailer through the back door. Paramedics arrived and declared Cheryl dead. Van Sandt then asked about Carol, saying she was in the room where Williams' dog—which was barking loudly—was secured. Officers looked through the outside window and saw Carol lying on the floor next to her wheelchair. The officers then called animal control to deal with the dog; once it was removed, paramedics went back in and declared Carol dead. (Docs. 193-1, 193-5, 193-6.)

Robert Hemmert, the lead investigator, and Jacqueline Grossi, the lead crime scene analyst, arrived on the scene less than an hour later, just before 10:00 a.m. Grossi was fairly new; this was her first case as lead analyst. They searched the crime scene. Because Cheryl had been stabbed so many times—the medical examiner later found over 125 stab wounds—there was blood everywhere. There were also bloody shoeprints throughout the trailer. There were signs of a struggle, as furniture was knocked over. (Doc. 193, pp. 82:25–83:4,

_____

[3] Van Sandt came to the trailer barefoot.

117:24–118:4, 121:17–124:8; Doc. 193-3, p. 1; Doc. 193-5; Doc. 194, p. 71:4–6; Doc. 236-14, p. 7.)

Around 11:30 a.m., Hemmert interviewed Van Sandt. He told Hemmert he came back to the trailer that morning to pick up Williams' work clothes, which had been left in the washing machine when she and her mother were fighting the night before. (No one ever checked the machine to see if the work clothes were there.) He told Hemmert that Williams had intermittent explosive disorder and had been Baker Acted multiple times.[4] He also admitted he was a sex offender on probation. He volunteered that Aguirre (whom he called "Little Mexico") had come into the trailer without permission on prior occasions. He also volunteered that his father worked for the Orange County Sheriff's Office. He had several cuts on his body, but no one questioned him about them. (Doc. 193, pp. 222:18–24, 223:10–20, 238:17–18, 238:25–239:2; Doc. 198, p. 62:7–19; Doc. 236-14, pp. 7, 17.)

Officers then questioned the neighbors. They interviewed Aguirre, who initially denied any knowledge of the murders. He then left the scene and returned to his friend's house where he had been the night before. (Doc. 187, pp. 104:9–106:21, 113:10–15.)

---

[4] Hemmert did not request the underlying hospital records. They would have told him that Williams had a drug problem since the age of twelve, had blackouts and hallucinations, threatened to kill her mother while she was in the hospital, and was isolated because of her potential for endangering others. (Doc. 193, pp. 282:16–24, 326:8–330:17.)

Officers also interviewed Weaver, who confirmed that Cheryl told his girlfriend Schroyer about the argument with Williams the night before. Schroyer walked in before the end of the interview with Weaver, but it does not appear that she was interviewed. (Doc. 193, pp. 144:2–5, 146:21–10.)

The canvas widened throughout the neighborhood. In the alley behind the Williams trailer was a dumpster, in which officers found a left-handed glove[5] and a Reebok shoe. No one followed up on whether these clothes belonged to anyone on the scene. (Doc. 187, pp. 137:6–138:5, 138:24–139:11; Doc. 198, pp. 187:24–188:5.)

Meanwhile, Williams was still at the Van Sandts' house. She claimed that she tried to reach Van Sandt's cell phone that morning to see why he had not returned, but she could not reach him because he left his phone with her at his parents' house. (Hemmert did not later follow up with Williams about this inconsistency, as Van Sandt used his cell phone to call 911 and had it on him.) Van Sandt's father told Williams about what happened to her mother and grandmother. He then drove Williams to the crime scene. (Doc. 193, pp. 233:22–234:5, 273:17–274:9.)

Hemmert interviewed Williams around 1:30 p.m. Williams admitted that she and her mother had gotten into an argument the night before. She said she used to get physically violent with her mother but did not do that anymore. When

---

[5] No one asked about Williams' or Van Sandt's dominant hand.

Hemmert asked Williams where she stayed that night, she paused before answering; she ultimately said that she and Van Sandt had stayed at her friend Phil's house—not Van Sandt's parents. Hemmert picked up on her hesitation and called her out for lying. Williams then changed her answer, saying she had lied because Van Sandt's parents did not like her. Williams volunteered, as had Van Sandt, that Aguirre had entered the trailer during the night without permission on prior occasions. (Doc. 193, pp. 242:22–25, 268:5–11, 268:17–269:11; Doc. 236-16, pp. 10–13, 17, 19–20.)

Despite Van Sandt's disclosures about her intermittent explosive disorder and Baker Act hospitalizations, Hemmert did not ask Williams about her mental health during her one and only interview. No one collected DNA swabs from Williams, photographed her, examined her for wounds, collected her shoes, or took her prints. (Hemmert says he directed this be done, but Grossi denies it.) Hemmert saw a wound on Williams' arm during the interview, but she said it was a burn mark from her work at the restaurant, which Hemmert accepted at face value. (Doc. 193, pp. 280:19–281:22, 365:22–366:22; Doc. 194, pp. 61:21–62:8, 140:21–141:5, 221:5–7, 223:18–19; Doc. 194-13, p. 75; Doc. 236-16, p. 30.)

Officers later spoke to Van Sandt's mother, who said she had no idea if Williams actually stayed the night at her house. No one checked the Van Sandt residence for evidence, and no one interviewed Van Sandt's father, though

Hemmert says he directed these things be done. (Doc. 193, pp. 245:17–247:15, 254:2–20, 364:21–365:7; Doc. 204, pp. 113:25–114:4, 121:7–15; Doc. 204-7, pp. 11–12; Doc. 236-14, pp. 14, 35.)

Later that afternoon, officers searched the yard, where a fence separated the Williams home from Aguirre's. They found a bloody ten-inch chef's knife, Sysco brand, just over the fence on Aguirre's side. (Doc. 193, pp. 135:3–136:25; Doc. 193-3, p. 2; Doc. 236-12, p. 2.)

Around 7:30 p.m., nearly twelve hours after Cheryl's and Carol's bodies were discovered, the medical examiner arrived and retrieved them. No one until then had touched the bodies to gauge rigor mortis (other than Van Sandt and Aguirre, who both claimed Cheryl was stiff and cold by early morning). By that point, with rigor retreated, it was impossible to estimate the time of death, and Hemmert did not ask the medical examiner to attempt to do so. (Doc. 193, pp. 110:10–114:20, 305:25–7.)

Meanwhile, after talking to his friend about what to do, Aguirre returned to his house voluntarily that evening, determined to tell the police the truth about discovering the bodies. Officers then questioned him again; he was not taken into custody. During this interview (unlike the first), a Spanish-speaking officer, Diane Toranzo, was present to translate. Aguirre was friendly with Toranzo as she and her husband often went to the same bar where Aguirre played pool. Several

minutes into the interview, the officers asked to see Aguirre's shoes. Aguirre then asked Toranzo if he could speak with her alone. He admitted to Toranzo he had lied during his first interview because he was scared about his immigration status, but he wanted to tell the truth. She encouraged him to tell the truth to the other officers. Frightened and back in the presence of the others, he stopped at telling them he had found Cheryl's body that morning—not recounting that he had gone further into the trailer, found Carol, and picked up the knife. But he maintained his innocence of the murders. (Doc. 187, pp. 52:11–19, 117:10–22, 119:3–9, 120:10–121:12, 121:15–19, 122:8–25; Doc. 236-12, pp. 2–3.)

That night, Aguirre was arrested for tampering with evidence. Analysts collected his clothes and shoes, photographed him, took DNA swabs, and took his prints. He had no cuts on him. He was wearing Reeboks—the same brand as the abandoned shoe from the dumpster—in size 7.5, small for a man because of his short stature. He was transported to jail. He was not eligible for bond because he was undocumented. (Doc. 193, pp. 292:22–293:20; Doc. 194, pp. 164:21–165:5; Doc. 236-12, pp. 2–3.)

The next day, June 18, officers interviewed Aguirre's roommates. At some point, one of them had taken a knife home from the restaurant where all three worked, but they could not locate the knife in the house. Analysts then took DNA

swabs from the roommates (both of whom are Hispanic).[6] Later that day, officers interviewed Aguirre's boss. He said the restaurant had bought a set of Sysco knives—the same restaurant brand as the murder weapon—a while ago, and a ten-inch chef's knife (along with others) was now missing. Officers also located a box marked Sysco in the Williams trailer, but no one ever opened it, nor did anyone check the restaurant where Williams worked. (Doc. 193, pp. 296:15–20, 314:11–17, 335:2–17; Doc. 193-3, pp. 1–2; Doc. 204-9, pp. 11–12; Doc. 204-11; Doc. 236-12, pp. 2–3.)

The following days focused on evidence collection. Analysts found a latent print from the handle of the murder weapon and sent a photograph of it for examination. They also found a clump of hair on Cheryl's body, but no one ever checked the hair for DNA. The most painstaking job was collecting all the blood from the Williams trailer. Grossi collected 150 blood samples from the trailer, including blood that came from the outside of Williams' open bedroom window. But Grossi, in consultation with Hemmert, did not test a single one of these blood samples. Only evidence from Aguirre's house, along with evidence from the murder weapon and victims, was sent for testing. (Doc. 193, pp. 159:12–160:2, 160:7–13; Doc. 193-3, pp. 3, 6; Doc. 194, pp. 124:12–125:5, 127:11–13, 173:17–21,

---

[6] They did not take DNA swabs from Van Sandt or Williams, who are white. (Doc. 193-3, pp. 1–2; Doc. 198, p. 68:8–19.)

178:5–182:6, 213:22–214:9; Doc. 194-13, p. 75; Doc. 199-1; Doc. 236-5, p. 61; Doc. 236-12, p. 3.)

On June 24, one week after the murders, Donna Birks, the print examiner, examined the photograph of the print on the murder weapon. She quickly concluded that the print matched Aguirre's left palm. William McQuay, an older examiner, verified Birks' identification. (Doc. 185-1, ¶¶ 13, 16; Doc. 209, pp. 228:21–229:9; Doc. 236-12, p. 3.)

On June 25, the morning after receiving Birks' identification, Hemmert arrested Aguirre for the murders. Hemmert swore out an arrest report and affidavit, based on which a judge found probable cause. A few weeks later, a grand jury indicted Aguirre for the murders. (Docs. 236-12, 236-27, 236-28.)

In October, months after Aguirre had been arrested, the results came back on the evidence that was sent for testing. (None of the blood samples from the Williams trailer was sent for testing.) The tests confirmed Cheryl's blood on Aguirre's clothes and Cheryl's and Carol's blood on the knife. None of Aguirre's blood was found on anything. Analysts concluded that the bloody shoeprints at the scene could have been made by Aguirre's Reebok shoes—though no one checked whether the Reebok shoe from the dumpster could have made the footprints. (Doc. 194, p. 165:6–8; Doc. 198, p. 159:7–16; Doc. 199-1; Doc. 236-12, p. 3.)

Aguirre was tried two years later, in 2006. At trial, Williams was the star witness, testifying that her family did not have a knife like the murder weapon and that Aguirre had come into the trailer without permission on prior occasions. Aguirre was convicted and sentenced to death after a split recommendation from the jury. *See Aguirre-Jarquin v. Fla.*, 202 So. 3d 785, 786–88, 794 (Fla. 2016).

In 2007, a year after Aguirre was convicted, a junior print examiner raised concerns to the Sheriff about Birks' competency. The Sheriff then launched an investigation. The Florida Department of Law Enforcement ("FDLE") re-examined every single identification made by Birks that resulted in arrest. An outside print expert also reviewed the prints. The FDLE's report (Doc. 209-1 ("Report")) concluded, based on multiple analysts' findings, that Birks had incorrectly identified at least half a dozen print matches—including Aguirre's. Birks was forced to resign, and the Sheriff publicly stated that she had no credibility as a print examiner. (Doc. 209, pp. 234:18–236:5; Doc. 209-1, pp. 33–35, 55, 57–60, 63; Doc. 236-31.)

In the ensuing years, Aguirre's appellate attorneys got permission to test the previously unexamined blood samples from the murder scene. Several came back matching Williams; none matched Aguirre. And Williams confessed to several people several times that she had killed her mother and grandmother. Based on the newly tested blood samples and Williams' confessions, the Florida Supreme

14

Court vacated Aguirre's conviction in 2016, after he spent a decade on death row. Aguirre remained in prison for two more years while the state prepared to re-try him. In 2018, the state dropped the charges and he was released. *See Aguirre-Jarquin*, 202 So. 3d at 791–95; (Doc. 236, p. 32).

So Aguirre sued lead investigator Hemmert, lead analyst Grossi, print examiner Birks, and the Sheriff. He brings these claims: (1) a 42 U.S.C. § 1983 claim against Birks for violating the Fourteenth Amendment right to a fair trial via fabrication of evidence; (2) a § 1983 claim against Hemmert for violating the right to a fair trial via failure to disclose *Brady* material; (3) a § 1983 claim against Birks and Hemmert for malicious prosecution in violation of the Fourth Amendment; (4) a § 1983 claim against Hemmert and Grossi for violating the due process right to a fair trial via a constitutionally inadequate investigation; (5) a § 1983 municipal liability claim against the Sheriff for failure to enact adequate policies or training for investigations; (6) a similar municipal liability claim for exculpatory evidence; and (7) a Florida law claim against Hemmert, Grossi, and Birks for intentional infliction of emotional distress ("IIED"). (Doc. 111.)

Birks, Hemmert, Grossi, and the Sheriff filed summary judgment motions. (Docs. 185, 234, 236, 251, 255, 258.) All parties also filed *Daubert* motions. (Docs. 181–84, 220, 230–32.) Post-summary judgment briefing, Aguirre moved to drop his malicious prosecution claim. (Docs. 263, 264.) These matters are ripe.

15

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant. *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 759 (11th Cir. 2006). Then the Court must decide whether there is "sufficient disagreement to require submission to a jury." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (cleaned up).

## ANALYSIS

### I.      Fabrication of Evidence

Count I is a § 1983 claim against Birks for violating Aguirre's due process right by fabricating evidence. (Doc. 111.) Birks asserts qualified immunity, arguing there is no evidence she fabricated the print match. (Doc. 185.) The Court disagrees.

Government officials sued for violating constitutional rights under § 1983 may invoke qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The inquiry has two steps: first, the government official must show she was engaged in a discretionary function.[7] *Holloman ex rel. Holloman v. Harland*, 370 F.3d

---

[7] Aguirre does not contest that Hemmert, Grossi, and Birks were engaged in discretionary

1252, 1264 (11th Cir. 2004). Second, the plaintiff must show: (1) the official violated his constitutional right; and (2) the right was clearly established at the time of the violation.[8] *Id.* To be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

It has long been clearly established that fabricating incriminating evidence violates the right to due process.[9] *See Riley v. City of Montgomery*, 104 F.3d 1247, 1253 (11th Cir. 1997). So the Court turns to whether Birks violated that right.

Here, there is a genuine dispute over whether Birks fabricated the print match. To this day, Birks insists she made no mistakes and her identification was correct. (Doc. 209, p. 58:9–25.) But Birks' own print expert does not even agree with her, opining that the print lacked sufficient reliable characteristics to make a positive identification. (Doc. 202, pp. 44:16–45:3.) And Birks was ousted from her

---

functions. (*See* Doc. 185, p. 21 n.16; Doc. 234, pp. 22–23.)

[8] Courts may consider these two questions in either order. *See Pearson v. Callahan*, 555 U.S. 223, 232–42 (2009).

[9] An earlier iteration of the Complaint framed this claim as a *Brady* violation, lumping it together with similar concealment allegations against the other Defendants. (*See* Doc. 45, ¶ 182.) The operative Complaint separated out this claim against Birks and focused it on the fabrication of evidence, limiting explicit *Brady* allegations to Hemmert. (*See* Doc. 111, ¶¶ 143, 188, 189, 214.) Aguirre now urges the Court to recognize a *Brady* violation founded on fabrication of evidence, but provides no case law from the U.S. Court of Appeals for the Eleventh Circuit acknowledging such a claim. (Doc. 251, p. 17 n.17); *cf. Diaz-Martinez v. Mia.-Dade Cnty.*, No. 07-20914, 2009 WL 2970471, at *12 (S.D. Fla. June 9, 2009), *adopted in part*, 2009 WL 2970468 (S.D. Fla. Sept. 10, 2009). Because the allegations as repled focus on the fabrication of evidence as an independent due process violation—which is recognized under black-letter law—the Court considers this claim in that context and not *Brady*. (*See* Doc. 111, ¶ 190.)

job because the FDLE's Report concluded (based on multiple analysts' and an outside expert's findings) that Birks erroneously identified a positive match in Aguirre's case.[10] (Doc. 209-1, pp. 58–59.)

Further, construing inferences in the light most favorable to Aguirre, Aguirre submits evidence indicating that Birks did not just negligently make a positive identification when she should not have but intentionally or recklessly fabricated the match.[11] *Cf. Porter v. White*, 483 F.3d 1294, 1308 (11th Cir. 2007). Aguirre points to several times Birks sent a difficult print match verification to McQuay—a soon-to-be-retired older analyst with medical issues whom Birks considered incompetent.[12] More than once, Birks even sent a match to McQuay for verification after other examiners in the office disagreed with her identification— a serious policy violation. (Doc. 209, pp. 68:21–69:10, 162:24–163:5, 165:15–166:2;

---

[10] Birks argues the Report is inadmissible hearsay. (Doc. 255, p. 2.) But the factual findings in the Report are likely admissible as business records. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009); *see also Roxbury-Smellie v. Fla. Dep't of Corr.*, 324 F. App'x 783, 785 (11th Cir. 2009). And the analysts who made the statements may be called to give testimony at trial. *Cf. Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1015–16 (11th Cir. 1987). Because the statements in the Report could be reduced to admissible evidence at trial, the Court may consider them at summary judgment and need not rule on admissibility at this stage. *See Macuba v. Deboer*, 193 F.3d 1316, 1323–24 (11th Cir. 1999); *cf. Church of Scientology Flag Serv. Org. v. City of Clearwater*, 2 F.3d 1514, 1530 (11th Cir. 1993).

[11] Birks also argues the match was not material to the jury's decision. (Doc. 185, p. 21.) But the match was a crucial factor in Hemmert's decision to arrest Aguirre for the murders. (Doc. 193, pp. 306:21–307:17.) A reasonable jury could logically conclude from this and other evidence that the match was a crucial factor in Aguirre's arrest and later conviction.

[12] There is conflicting evidence about whether and when Birks had concerns about McQuay's health, but the evidence suggests McQuay was ill in early 2004, a year before he eventually retired. (*Compare* Doc. 209-1, pp. 31, 47, 50, 84, *with* Doc. 201, pp. 70:24–71:2.)

Doc. 209-1, pp. 29–35, 84.) Birks also showed a carelessness about the required verification process, failing to get certain prints verified by anyone else at all. (Doc. 209, pp. 83:10–20, 121:19–22, 145:5–9; Doc. 209-1, pp. 40–41, 60.) And on at least one occasion, Hemmert had gone to Birks to discuss a potential suspect before she made an identification, which she acknowledges could cause bias. (Doc. 209, pp. 255:10–260:18.) Drawing inferences from this evidence in the light most favorable to Aguirre, reasonable jurors could conclude that Birks intentionally sent the print in Aguirre's case to McQuay for an unquestioned verification—indicating Birks knew the match was false or harbored serious doubts about the veracity of her findings.[13] *Cf. Daniels v. Bango*, 487 F. App'x 532, 537 (11th Cir. 2012).

Ultimately, this issue boils down to the disputed question of Birks' intent. *See Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991). Because this question is one for the jury, summary judgment on Count I is inappropriate. *See Jones v. Cannon*, 174 F.3d 1271, 1290 (11th Cir. 1999). On the current record, qualified immunity for Birks is denied. *See Herren v. Bowyer*, 850 F.2d 1543, 1546 (11th Cir. 1988); *e.g. Riley*, 104 F.3d at 1253.

---

[13] Birks obliquely argues that this evidence would be inadmissible under Federal Rule of Evidence 404(b). (Doc. 255, p. 5.) But evidence falls outside Rule 404(b) where it is used to show intent, knowledge, or the absence of mistake. Fed. R. Evid. 404(b)(2).

## II.   *Brady* Violation

Count II is a § 1983 claim against Hemmert for violating Aguirre's Fourteenth Amendment right to a fair trial by failing to disclose exculpatory *Brady* material. (Doc. 111.) Aguirre argues that, because Hemmert was in possession of Williams' Baker Act commitment, he should have obtained and disclosed the underlying medical records from her hospitalization.[14] (Doc. 234, pp. 24–25); *see supra* note 4. But *Brady* is a disclosure rule, not a requirement to obtain evidence. *See Brady v. Maryland*, 373 U.S. 83, 87–91 (1963); *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir.), *amended on reh'g on other grounds*, 101 F.3d 1363 (11th Cir. 1996). While Hemmert's failure to obtain certain evidence is relevant to the adequacy of the investigation, *Brady* by definition applies only to evidence in Hemmert's possession. *See United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989). Because Hemmert never requested or possessed Williams' hospital records, he could not have concealed them from Aguirre in violation of *Brady*. (*See* Doc. 234, p. 29.) So

---

[14] Aguirre also raises a spoliation issue for the first time. (Doc. 234, pp. 26–27.) But this case is past the point where Aguirre could have pled a spoliation claim or moved for a discovery sanction for spoliation, so this aside is inapposite. Even assuming this issue were properly raised, it is a nonstarter. Aguirre argues that, although Williams and Van Sandt were interviewed, there were "various facts" not contained in the recordings that were purportedly in handwritten notes—but there is no indication in the record that interviews other than the ones recorded ever took place or what facts Aguirre is referencing. Aguirre further asserts that, based on one of the officers' depositions, Diane Schroyer "would have" been interviewed, but no record of her interview was disclosed, yet that officer testified that he did not interview Schroyer, nor does it appear that anyone else did. (*See* Doc. 204, pp. 99:16–100:17.) With no indication these documents exist, let alone were concealed, this argument does not save the *Brady* claim.

Hemmert is entitled to summary judgment on Count II.

### III.   Malicious Prosecution

Count III is a § 1983 claim against Birks and Hemmert for malicious prosecution. (Doc. 111.)

As a threshold matter, after the summary judgment motions ripened, Aguirre moved to drop this claim; Defendants opposed. (Docs. 263, 264.) The proper vehicle for dropping a claim at this stage is amendment of the complaint under Federal Rule of Civil Procedure 15. *See Perry v. Schumacher Grp. of La.*, 891 F.3d 954, 958 (11th Cir. 2018). When the deadline to amend has passed, the plaintiff must also show good cause under Rule 16. *See Gov't Emps. Ins. Co. v. Glassco Inc.*, No. 8:19-cv-1950, 2022 WL 705154, at *1 (M.D. Fla. Mar. 9, 2022). The Court agrees with Defendants that Aguirre has not shown good cause for dropping this claim so late, after the summary judgment briefing closed. *See Smith v. Sch. Bd. of Orange Cnty.*, 487 F.3d 1361, 1367 (11th Cir. 2007). So Aguirre's motion to amend is due to be denied.

Turning then to the substance of the malicious prosecution claim, Defendants assert there was arguable probable cause for Aguirre's arrest, entitling them to qualified immunity. (Doc. 236, pp. 44–50.) The Court disagrees.

The U.S. Court of Appeals for the Eleventh Circuit recently sharpened the contours of claims founded on unlawful seizures in violation of the

Fourth Amendment under the moniker of malicious prosecution. *See generally Williams v. Aguirre*,[15] 965 F.3d 1147 (11th Cir. 2020). Under the most recent simplified articulation, to establish malicious prosecution, a plaintiff must show: "(1) that the defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process and (2) that the criminal proceedings against him terminated in his favor." *Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020).[16] There can be no serious question that the proceedings against Aguirre terminated in his favor when the Florida Supreme Court vacated his conviction and prosecutors dropped all charges. (Doc. 236, p. 32); *Aguirre-Jarquin*, 202 So. 3d at 794–95; *see Laskar v. Hurd*, 972 F.3d 1278, 1295 (11th Cir. 2020). So the Court turns its focus to the Fourth Amendment prong.

For the purposes of qualified immunity, Aguirre must show both the underlying Fourth Amendment violation and that the right violated was clearly established. *See Holloman*, 370 F.3d at 1264. It has long been clearly established that officers must conduct a "reasonable investigation" to establish probable cause and that an arrest made without probable cause violates the Fourth Amendment.

---

[15] Different Williams and different Aguirre.

[16] In full, the elements of a Fourth Amendment malicious prosecution claim are a Fourth Amendment violation plus the elements of common law malicious prosecution. *See Luke*, 975 F.3d at 1143. The common law elements are that officials instituted criminal process against the plaintiff with malice and without probable cause and the prosecution terminated in his favor. *Id.* at 1143–44. Because the elements overlap (such that a Fourth Amendment violation establishes criminal process with malice and without probable cause as well as causation), the Eleventh Circuit simplified the recitation of the standard as articulated above. *Id.* at 1144.

*Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998). It has also long been clearly established that reckless material misstatements or omissions in an arrest affidavit negating probable cause similarly violate the Fourth Amendment. *See Franks v. Delaware*, 438 U.S. 154, 155–66 (1978); *Jones v. Cannon*, 174 F.3d 1271, 1285 (11th Cir. 1999); *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997).

With the clearly established prong met, the Court must determine whether the Fourth Amendment was violated. "[A] warrant affidavit violates the Fourth Amendment when it contains omissions made intentionally or with a reckless disregard for the accuracy of the affidavit." *Madiwale*, 117 F.3d at 1327 (cleaned up). So in this context, the Court must consider: "(1) whether the alleged misstatements in the affidavit were made either intentionally or in reckless disregard for the truth and, if so, (2) whether, after deleting the misstatements, the affidavit is insufficient to establish probable cause." *United States v. Kirk*, 781 F.2d 1498, 1502 (11th Cir. 1986).

Aguirre's best case raises a substantial question about both the reasonableness of the investigation and the materiality and recklessness of omissions in the arrest affidavit, precluding summary judgment. As to the arrest affidavit, there is a genuine issue of material fact as to whether Birks fabricated the print match Hemmert relied on.[17] (Doc. 193, pp. 306:21–307:17.) And a reasonable

---

[17] Though Hemmert, not Birks, signed the affidavit, Birks can still be held liable if she

jury considering the way Hemmert conducted his investigation could infer that Hemmert intentionally or recklessly settled on Aguirre—an undocumented Hispanic immigrant—as the only suspect, selectively including information in the affidavit to point to Aguirre and excluding doubts and inconsistencies implicating Williams (as discussed below).[18] (*See* Doc. 193-3, pp. 1–2); *Williams*, 965 F.3d at 1166, 1169–70. As Birks' and Hemmert's intent is a question for the jury, summary judgment is inappropriate on this ground.

Just probable cause remains, then. "Probable cause to arrest exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990) (cleaned up). Probable cause turns on the "totality of the circumstances." *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294 (11th Cir. 2018). In evaluating probable cause, an officer may not be willfully blind and choose not to obtain readily discoverable information that may exculpate a suspect, nor may he ignore discrepancies giving rise to doubts about the guilt of a suspect. *See Kingsland v. City of Mia.*, 382 F.3d 1220, 1229,

---

intentionally or recklessly made false statements on which the affidavit relied. *See Laskar*, 972 F.3d at 1296–97; *Williams*, 965 F.3d at 1169.

[18] Defendants briefly assert that the later grand jury proceeding severed liability for any investigative misconduct, but the U.S. Supreme Court has permitted similar claims to proceed even after an indictment. *See Manuel v. City of Joliet*, 580 U.S. 357, 369 n.8 (2017).

1233 (11th Cir. 2004);[19] *Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989).

For qualified immunity purposes, there need be only arguable probable cause. *See Fox v. Graff*, 276 F. App'x 936, 938 (11th Cir. 2008). "Arguable probable cause exists when an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." *Storck v. City of Coral Springs*, 354 F.3d 1307, 1315 (11th Cir. 2003). When an arrest was made based on an affidavit, the question is "whether the affidavit[] still would have established probable cause . . . if the[] [officers] had included the omitted information that they knew about." *Paez v. Mulvey*, 915 F.3d 1276, 1287–88 (11th Cir. 2019).

We begin by looking at the totality of the circumstances and the information in the officers' knowledge. Here is what Hemmert knew about Aguirre before receiving Birks' purportedly fabricated print match:

- Aguirre lied at first about his alibi
- Aguirre had been drinking the night of the murders
- Aguirre had previously entered the trailer unannounced and uninvited
- Aguirre had blood on his clothes and shoes
- Aguirre hid his bloody clothes
- The murder weapon was found on Aguirre's property
- A knife similar to the murder weapon could have been missing from Aguirre's work[20]

---

[19] *Kingsland* was abrogated in part by *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019), which held that courts must look common law principles from the time § 1983 was enacted (rather than modern law as *Kingsland* had done) to determine the scope of malicious prosecution. But the Eleventh Circuit later re-examined that scope given *Nieves* and concluded that the probable cause element of malicious prosecution, even considered from the time § 1983 was enacted, continues to apply. *See Williams*, 965 F.3d at 1159–61. So *Kingsland*'s holding and analysis of probable cause and the sufficiency of investigations remain intact.

[20] (Doc. 187, pp. 50:1–6, 56:1–7, 58:12–15, 65:1–16, 67:4–7, 77:25–78:2, 104:9–106:21; Doc. 193,

If that were all the evidence Hemmert had, arguable probable cause would have been clear. But this is only half the story—because here is what Hemmert also knew:

- Williams lied at first about her alibi
- Williams had been drinking the night of the murders
- Williams had anger and mental health issues
- Williams was diagnosed with intermittent explosive disorder
- Williams had been Baker Acted before
- Williams fought with her mother the night of the murders
- Williams had a historically bad relationship with her mother
- Williams had gotten into physical fights with her mother
- Williams' mother had been stabbed over 125 times
- Williams' boyfriend had serious ongoing trouble with the law
- Williams and her boyfriend had various inconsistencies in their stories
- Williams and her boyfriend both had wounds on their bodies[21]

So Hemmert had two potential suspects side-by-side, both of whom had been drinking the night of the murders and both of whom had lied about their whereabouts. But Hemmert laser-focused on Aguirre, rationalizing away questions and inconsistencies about Williams that should have raised doubts in the mind of any objectively reasonable officer. (Doc. 193, pp. 218:5–16, 287:8–219:20.) And this willful blindness caused Hemmert to fail to investigate many pieces of readily available information that could have clarified the true facts. For instance, Hemmert and his team failed to:

---

p. 296:15–20; Doc. 193-3, p. 2; Doc. 204-9, pp. 11–12; Doc. 236-12, pp. 2–3.)

[21] (Doc. 187, p. 142:14–18; Doc. 193, pp. 125:14–133:5, 149:4–19, 224:25–225:17, 238:17–18, 238:25–239:2, 268:5–11, 273:17–274:9, 276:18–22, 319:18–320:21, 324:9–22, 366:12–22; Doc. 198, p. 62:7–19; Doc. 236-14, pp. 2–3; Doc. 236-16, pp. 10, 12–13, 17, 30.)

- Test a single piece of blood evidence from the murder scene
- Question Williams about her mental health and anger issues
- Collect Williams' shoes, clothes, DNA, or prints
- Collect Van Sandt's DNA
- Confirm Williams' alibi
- Check Van Sandt's parents' house for evidence
- Confirm whether Williams' work clothes were in the washing machine (thereby failing to confirm Van Sandt's reason for being on the murder scene and potentially missing key blood evidence)
- Account for "overkill," or the many wounds on Cheryl, potentially indicating motive or a close relationship with the victim
- Confirm degree of rigor mortis and likely time of death
- Follow up on inconsistencies in Williams' and her boyfriend's stories
- Follow up on wounds on Williams and her boyfriend despite indications that Cheryl fought with her killer
- Test the clump of hair found on Cheryl's body, again ignoring indications Cheryl fought with her killer
- Follow up on clothing dumped near the house—including a Reebok shoe that could have made the bloody footprints
- Interview one of the last people to see Cheryl alive, Diane Schroyer
- Investigate a box on the murder scene containing restaurant equipment the same brand as the murder weapon[22]

Perhaps missing one or two of these red flags might be negligent rather than unconstitutionally defective. But with this many holes and inconsistencies, no reasonable officer would plow ahead with an arrest without further investigation. And the fabricated print match put the nail in the coffin. If the fabricated print match were removed from the arrest affidavit and all of the omissions pointing to

---

[22] (Doc. 193, pp. 110:10–114:20, 125:14–133:5, 137:20–138:5, 138:24–139:11, 146:21–147:10, 159:12–160:2, 160:7–13, 222:18–24, 223:10–20, 224:25–225:17, 245:17–247:15, 254:2–20, 273:17–274:9, 280:19–281:22, 305:25–7, 335:2–17, 364:21–365:7, 365:22–366:22; Doc. 193-1; Doc. 193-3, pp. 1–3; Doc. 194, pp. 61:21–62:8, 127:11–13, 140:21–141:5, 164:21–165:5, 221:5–7, 223:18–19; Doc. 194-13, p. 75; Doc. 198, pp. 62:7–19, 68:8–19, 159:7–16, 187:24–188:5; Doc. 204, pp. 113:25–4, 121:7–15; Doc. 204-11; Doc. 236-12, p. 3; Doc. 236-14, pp. 14, 16, 35; Doc. 236-16, p. 28.)

Williams included, no warrant would have issued.[23] *See Franks*, 438 U.S. at 156. So on Aguirre's best facts, there is no arguable probable cause. *See Tillman*, 886 F.2d at 321; *Cozzi*, 892 F.2d at 1297–98; *Daniels*, 487 F. App'x at 537–39. Because there are genuine disputes over whether intentional or reckless misstatements or omissions in the arrest affidavit existed such that the rest of the affidavit did not establish arguable probable cause, qualified immunity is denied at this stage. *See Kingsland*, 382 F.3d at 1233–34. Summary judgment on Count III is due to be denied.

## IV.    Inadequate Investigation

Count IV is a § 1983 claim against Hemmert and Grossi for violating Aguirre's due process right to a fair trial by conducting a constitutionally inadequate investigation. (Doc. 111.) Defendants argue that their various missteps and failures sound in negligence and were not constitutionally deficient, entitling them to qualified immunity. (Doc. 236, p. 54.) Again, the Court disagrees.

It has long been clearly established that due process requires that officers take steps to eliminate doubts about a suspect before arrest.[24] *See Tillman*, 886 F.2d

---

[23] There is no evidence that Hemmert knew Birks' print match may have been fabricated. Even with him assuming the match was valid, though, Hemmert was aware of so much troubling information about Williams that every reasonable officer in his shoes would have followed up before swearing out an arrest affidavit. But by that time, even before sending out any physical evidence for testing, Hemmert was already convinced of Aguirre's guilt. (Doc. 193, pp. 218:5–16.)

[24] At the motion to dismiss stage, the Court concluded that it is so obviously clear as to be clearly established, even without prior case law, that conducting a deficient investigation lacking in even arguable probable cause violates due process just as it violates the Fourth Amendment. (Doc. 108, pp. 21–23); *see Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). And that remains true, as the U.S. Supreme Court has concluded that due process takes over and governs

at 321.[25] With the right to due process in the form of an adequate investigation clearly established under these circumstances, the Court turns to the other half of the qualified immunity analysis: whether Hemmert and Grossi violated Aguirre's due process right to a fair trial by conducting a constitutionally infirm investigation that failed to eliminate major doubts and inconsistencies.

"[T]o establish a due process violation, a plaintiff must show that the officer acted with deliberate indifference, [that is], demonstrating that the officer had subjective knowledge of a risk of serious harm and disregarded that risk by actions beyond mere negligence." *Helm v. Rainbow City*, 989 F.3d 1265, 1278–79 (11th Cir. 2021). An officer recklessly disregards the truth when doubts and inconsistencies give him cause to investigate further. *Daniels*, 487 F. App'x at 537.

Here, for the reasons discussed above and on Aguirre's best version of the facts, there were so many red flags that no reasonable officer would have arrested Aguirre for murder without further investigation. A reasonable jury could conclude that the investigation, viewed in its totality and construed in the light most favorable to Aguirre, was designed to support a predetermined end:

---

probable cause violations once the Fourth Amendment drops off at trial. *See Manuel*, 580 U.S. at 364–70 & n.8. That said, as the case record developed and the facts surrounding the investigation were established, it became clear that the broader principles of *Tillman* control here.

[25] *Cf. Napue v. Illinois*, 360 U.S. 264, 269 (1959) (holding that obtaining a conviction through false evidence violates due process); *United States v. Agurs*, 427 U.S. 97, 103 (1976), *clarified by United States v. Bagley*, 473 U.S. 667, 682 (1985) (noting that misconduct corrupts the "truth-seeking function of the trial" and examining constitutional violation in light of the "overriding concern with the justice of the finding of guilt").

Aguirre's guilt. Hemmert and Grossi were aware of serious questions and inconsistencies about Williams' behavior that should have given rise to doubts as to whether Aguirre committed the murders, yet they disregarded the risk of arresting (and later convicting) a potentially innocent man. Why did Hemmert choose not to follow up on Williams as a suspect,[26] even though he knew she had a motive, a history of anger and mental health issues, and lied about her alibi?[27] Why did Grossi choose to test only evidence from Aguirre's house but not one drop of blood from the murder scene?[28] The answers rest in the hands of the jury.

Because there are genuine questions about whether Hemmert and Grossi acted with deliberate indifference in conducting an insufficient investigation that violated Aguirre's right to due process, they are not entitled to qualified immunity at this stage. *Cf. Daniels*, 487 F. App'x at 537. So summary judgment on Count IV

---

[26] There is a genuine factual dispute on this point, as Hemmert testified that he told multiple people, including Grossi and another officer, to follow up on certain things that they did not do—such as photographing Williams for wounds and checking for evidence at the Van Sandt house. But they deny Hemmert ever instructed them to do those things. (Doc. 193, pp. 232:10–233:19, 366:22–367:11; Doc. 194, pp. 140:21–141:5, 211:2–11; Doc. 204, p. 121:7–15.) A jury will need to make credibility findings on whether Hemmert actually did order follow-ups concerning Williams—and if not, why.

[27] The failure to further investigate the true circumstances surrounding Williams also undermines the fundamental fairness of the trial, given that Williams was a key witness. *See supra* note 25; *Aguirre-Jarquin*, 202 So. 3d at 794–95; *cf. Schneider v. Estelle*, 552 F.2d 593, 595 (5th Cir. 1977) (holding that due process claim would lie where officers suborn perjury at trial).

[28] Grossi is not named in the malicious prosecution claim, but based on the same evidence discussed above, a reasonable jury could infer from the undisputed facts of Grossi's failure to test the 150 blood samples from the scene and failure to take any samples from Williams that she intentionally or recklessly disregarded the potential consequences to Aguirre. (*See* Doc. 194, pp. 37:5–11, 125:2–5, 127:11–13, 153:6–154:4, 161:23–162:14, 213:22–214:9, 218:12–13.)

is due to be denied.

### V.      Failure to Train

Counts V and VI are § 1983 municipal liability claims against the Sheriff for failure to enact adequate training policies related to investigations and exculpatory evidence. (Doc. 111.) The Sheriff argues that there were no underlying constitutional violations to anchor municipal liability and that Aguirre fails to identify any deliberate indifference to the need for training in these areas. (Doc. 236, pp. 55–58.) The Court agrees these claims are insufficient.

An official is only subject to municipal liability where the government's policy or custom was the moving force of the constitutional violation. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). An official's failure to train employees about a certain topic rises to the level of a *Monell* policy or custom only where it amounts to "deliberate indifference" to constitutional rights. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) (cleaned up). Failure to train is actionable "in only a very narrow range of circumstances." *Mingo v. City of Mobile*, 592 F. App'x 793, 800 (11th Cir. 2014). Deliberate indifference is typically shown by a pattern of similar constitutional violations, but it can also be established if the need to train on that topic is "so obvious" that the single alleged violation is actionable. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1328–29 (11th Cir. 2015). Deliberate indifference is a "stringent" standard. *Connick*, 563 U.S. at 61.

31

As to training on investigations, Aguirre argues narrowly that the Sheriff's policy manual improperly fails to instruct officers to research "mental health backgrounds of the victims of crimes and their family members" as part of investigations, unlike the manual's requirement to research criminal histories. (Doc. 234, pp. 43–44.) Aguirre did not point to a pattern of similar instances caused by constitutionally inadequate investigations, arguing only that the need to train on this issue was obvious because of the high number of Baker Act commitments. (*Id.* at 41–43.) But the high number of people involuntarily hospitalized for mental illness does not necessarily suggest that law enforcement officers should be made to investigate the mental health backgrounds of the families of victims of crimes, as Aguirre urges; this would in some cases be unnecessary and even inappropriate. Law enforcement may have conducted a constitutionally inadequate investigation here, but it does not automatically follow that the Sheriff is constitutionally obligated to enact a written policy requiring the investigation of mental health backgrounds of all family members of crime victims, as such investigation may not be warranted under the facts of a particular case and would not remedy the constitutional problem in many circumstances. *Cf. Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1053 (11th Cir. 2014). Because Aguirre has not pointed to any facts in the record showing that the need for the policy he suggests is "so obvious" that this single incident confers liability on the Sheriff, there is no genuine dispute

as to deliberate indifference and thus no *Monell* claim. *Cf. Johnson v. Dixon*, 666 F. App'x 828, 831 (11th Cir. 2016); *Denham v. Corizon Health, Inc.*,  675 F. App'x 935, 942 (11th Cir. 2017). So the Sheriff is entitled to summary judgment on Count V.

As to training on disclosure of exculpatory evidence, there can be no *Monell* claim where there is no underlying constitutional violation. *Knight ex rel. Kerr v. Mia.-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017). Because the Court finds no *Brady* violation, as discussed above, there is no actionable claim against the Sheriff for failure to train on *Brady* obligations. So the Sheriff is also entitled to summary judgment on Count VI.

## VI.     IIED

Finally, Count VII alleges an IIED claim against Birks, Hemmert, and Grossi. (Doc. 111.) Defendants make no substantive argument on this claim, arguing only that it fails to establish outrageousness because they supposedly did not commit the misconduct of which they are accused.[29] (*See* Doc. 185, p. 13; Doc. 236, pp. 59–60.) But because there are factual disputes about this misconduct—which, if true, resulted in the lengthy imprisonment and impending execution of a potentially innocent man—summary judgment is precluded on this claim. *See Spadaro v.*

---

[29] Hemmert and Grossi briefly assert they are entitled to statutory immunity under Florida Statutes § 768.28(9)(a), which provides officers immunity within the scope of their employment unless they acted in bad faith. (Doc. 236, p. 60.) But there are factual disputes over whether they acted in bad faith, so the claim must proceed to trial.

*City of Miramar*, No. 11-61607, 2013 WL 495780, at *11 (S.D. Fla. Feb. 7, 2013), *aff'd*, 591 F. App'x 906 (11th Cir. 2015); *see also Tillman v. Orange Cnty.*, 519 F. App'x 632, 637 (11th Cir. 2013); *Diaz-Martinez v. Mia.-Dade Cnty.*, No. 07-20914, 2009 WL 2970468, at *14 (S.D. Fla. Sept. 10, 2009).

In sum, the fabrication of evidence, malicious prosecution, inadequate investigation, and IIED claims will proceed to trial.

### VII.   *Daubert* Motions

With the summary judgment motions resolved, the Court turns to the pending *Daubert* motions to exclude various experts (Docs. 181–84). Expert testimony may be admitted only if: (1) the expert is qualified; (2) their methodology is sufficiently reliable; and (3) the testimony will be helpful to the jury. *See Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

### A.   Bradford Fisher, Esq.

First, Aguirre moves to exclude Defendants' purported expert Bradford Fisher, Esq., an attorney who has not previously testified as an expert, because he offers only legal conclusions as opinions. (Doc. 181.) Questions of law are not subject to expert testimony, and experts offering only legal conclusions should be excluded. *See Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1128 (11th Cir. 2018). Here, Fisher opines about whether there was probable cause and

what was required of law enforcement. (Doc. 181-1, pp. 17, 19, 21, 24.) But "the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). As Fisher's opinions would invade the province of the Court and not help the jury determine any facts at issue, he must be excluded as an expert witness.[30] *See* Fed. R. Evid. 702; *see also Wash. v. City of Waldo*, No. 1:15CV73, 2016 WL 3545909, at *4 (N.D. Fla. Mar. 1, 2016). Aguirre's *Daubert* motion is due to be granted.

### B.    Dr. Heather Holmes

The remaining *Daubert* motions were jointly filed by Defendants. (Docs. 182–84.) They first move to exclude Aguirre's psychology expert, Dr. Heather Holmes. (Doc. 182.) Holmes opines that Aguirre suffers from post-traumatic stress disorder ("PTSD"), depression, and alcohol abuse because of his death row incarceration. (Doc. 182-1, p. 9.) Defendants argue that Holmes' opinion is not based on sufficient facts because she failed to "adequately account" for Aguirre's earlier diagnoses; specifically, they complain that Holmes did not review files created by doctors retained by Aguirre in connection with his earlier criminal trial, as they had diagnosed him with having PTSD, alcohol dependence, and a mood disorder before his incarceration. (Doc. 182, pp. 4–5.)

---

[30] Fisher also appears to have no methodology to speak of other than reviewing legal authority—of which the Court itself is more than capable. (Doc. 181-1); *see Bratt v. Genovese*, No. 8:13-cv-3210, 2017 WL 6344449, at *6 (M.D. Fla. Dec. 12, 2017).

Quibbles about the bases for an expert's opinion go to weight, not admissibility, so long as the expert is minimally qualified. *See In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 372 (M.D. Fla. 2018); *Garcia v. Scottsdale Ins. Co.*, No. CV 18-20509, 2019 WL 1318090, at *2 (S.D. Fla. Mar. 22, 2019); *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19MD2885, 2021 WL 2028682, at *6 (N.D. Fla. May 11, 2021).

Defendants do not challenge Holmes' qualifications or her methodology; those would be difficult to question, as Holmes has multiple psychology degrees and twenty years of experience, she has testified as an expert dozens of times, and she administered standard psychological tests on Aguirre and took a lengthy medical history before coming to her diagnoses. (Doc. 182-1, pp. 1–2, 8–9, 12–20; Doc. 182-2.) If Defendants want to cross-examine Holmes about whether Aguirre's prior diagnoses change any of her opinions, they are welcome to do so—though she already testified that they would not, and she clarified that her current diagnoses focus on Aguirre's condition post-death row. (Doc. 182-4, pp. 8:19–10:10, 54:7–55:21, 101:4–103:8); *see Daubert*, 509 U.S. at 596 (noting the role of "[v]igorous cross-examination [and] presentation of contrary evidence" in challenging experts at trial).

Because Defendants' challenge goes to weight, not admissibility, Holmes may testify. *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19MD2885,

2021 WL 948839, at *7 (N.D. Fla. Mar. 13, 2021); *Castro v. Carnival Corp.*, No. 21-20373, 2022 WL 3048255, at *3–6 (S.D. Fla. July 11, 2022).

### C.    Ron McAndrew

Next, Defendants move to exclude Aguirre's prison conditions expert, Ron McAndrew, a former warden who oversaw death row. Defendants do not contest McAndrew's qualifications or methodology, but contend that his testimony will not help the jury because it simply repeats what Aguirre told him. (Doc. 183.)

For expert testimony to be helpful, it must "concern[] matters that are beyond the understanding of the average lay person." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). An expert simply parroting a party's narrative account of events does not help the jury. *See 3M Combat Arms*, 2021 WL 948839, at *10; *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-2274, 2022 WL 3226794, at *4 (M.D. Fla. Aug. 10, 2022); *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1347 (S.D. Fla. 2010).

McAndrew's opinions focus on the conditions Aguirre experienced on death row and are largely (though not exclusively) based on McAndrew's interview with Aguirre; while McAndrew knows what it is like on death row based on his time as a prison warden, his opinions offer only facts, to which Aguirre himself can testify firsthand. (Doc. 183-1, pp. 2–4; Doc. 232-1, pp. 4–6);

*see Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen & Firemen Ret. Sys. of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995). Permitting McAndrew to parrot Aguirre's version of death row conditions would risk using expert testimony to bolster Aguirre's credibility and narrative. *See Ohio State Troopers Ass'n v. Point Blank Enters., Inc.*, No. 18-CV-63130, 2020 WL 1666763, at *15–16 (S.D. Fla. Apr. 3, 2020). McAndrew's opinions will not help the jury, so he may not testify.

### D.   Robert Pusins

Finally, Defendants move to exclude Aguirre's police practices expert, Robert Pusins. (Doc. 184.) Pusins opines that: (1) Hemmert and Grossi did not conduct a reasonable investigation; (2) Birks intentionally failed to accurately analyze the print; and (3) the Sheriff failed to provide reasonable oversight of Hemmert, Grossi, and Birks. (Doc. 184-1, pp. 10, 21, 25, 30.) The Court takes each opinion in turn.

First, Defendants do not challenge Pusins' opinions about the reasonableness of Hemmert and Grossi's investigation other than his opinion about Hemmert's state of mind—that is, that Hemmert acted intentionally and believed there was probable cause. (Doc. 184, p. 19; Doc. 184-1, pp. 11, 29, 30.) Defendants are correct that intent and state of mind are not proper areas for expert testimony. *See Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1326 (M.D. Fla. 2015); *In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769, 2009 WL 3806436, at *5 (M.D. Fla.

July 20, 2009). And probable cause is determined from an objective standpoint, so whether Hemmert subjectively believed there was probable cause is irrelevant; moreover, the determination of probable cause is for the Court, not the jury. *See Whren v. United States*, 517 U.S. 806, 813 (1996); *City of Waldo*, 2016 WL 3545909, at *4. These opinions are improper and will be excluded. Even so, Pusins may give the rest of his opinions about the reasonableness of Hemmert and Grossi's investigation, as he is well-qualified to give them, Defendants did not directly challenge them, and such opinions are commonly admissible. (*See* Doc. 184, p. 19); *Shew v. Horvath*, No. 8:16-cv-766, 2017 WL 632515, at *8 (M.D. Fla. Feb. 16, 2017) (permitting police practices expert to opine on whether standard procedures were followed during investigation even though legal conclusions on existence of probable cause were inadmissible).

Next, Defendants argue that Pusins is not qualified to give various opinions about Birks and her investigative techniques. (Doc. 184, pp. 5, 12, 17.) Aguirre counters that Pusins is qualified to testify about police investigations, so he can rely on the FDLE's Report to conclude that Birks failed to follow required print identification procedures. (Doc. 231, pp. 8–9.) Aguirre's argument here is unpersuasive. Pusins' CV makes clear that he is highly qualified on police practices but not on print examination. (Doc. 184-1, pp. 2–4, 35–38); *see Pleasant Valley Biofuels, LLC v. Sanchez-Medina*, No. 13-23046, 2014 WL 2855062, at *3

(S.D. Fla. June 23, 2014). And though an expert may rely on hearsay and investigative reports to establish facts, he must still perform the function of an expert in forming opinions based on those facts. *See Knight*, 856 F.3d at 809; *Williams v. Illinois*, 567 U.S. 50, 80 (2012). Pusins' opinions that Birks made an erroneous identification and did not follow print examiner procedures simply parrot the conclusions of the Birks Report—and necessarily so, as he has no expertise to draw those conclusions independently or verify the reliability of the findings.[31] (*See* Doc. 231, p. 19); *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 607 n.75 (N.D. Fla. 2009), *aff'd*, 609 F.3d 1183 (11th Cir. 2010); *Williams v. Consol. City of Jacksonville*, No. 3:00-cv-469, 2006 WL 305916, at *8 (M.D. Fla. Feb. 8, 2006); *Little v. Ford Motor Co.*, No. 1:16-CV-931, 2017 WL 6994586, at *10 (N.D. Ga. Dec. 21, 2017). Because Pusins is not qualified as a print expert, his opinions about Birks and the adequacy of her techniques are due to be excluded.

Last, as to Pusins' opinions about the Sheriff, the Court is granting summary judgment in the Sheriff's favor on all claims against him, so these opinions are irrelevant.

---

[31] Aguirre's response suggests he is hoping to admit the entire Birks Report through Pusins. (*See* Doc. 231, pp. 11, 18–19.) But just because an expert may rely on hearsay does not necessarily mean that the underlying hearsay document is itself admissible. *See* Fed. R. Evid. 703; *Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.*, No. 8:12-cv-691, 2014 WL 4986482, at *2–3 (M.D. Fla. Oct. 6, 2014). As discussed above, Aguirre has additional hurdles to clear to get pieces of the Report into evidence. *See supra* note 10.

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED**:

1.  Aguirre's motion to drop the malicious prosecution claim (Doc. 263) is **DENIED**.

2.  Birks' summary judgment motion (Doc. 185) is **DENIED**.

3.  Hemmert, Grossi, and the Sheriff's summary judgment motion (Doc. 236) is **GRANTED IN PART AND DENIED IN PART**:

    a.  The Motion is **GRANTED** as to Counts II, V, and VI. Summary judgment on those counts will be entered when the remaining claims are resolved.

    b.  The Motion is **DENIED** as to Counts III, IV, and VII.

4.  Counts I (fabrication of evidence), III (malicious prosecution), IV (inadequate investigation), and VII (IIED) will proceed to trial.

5.  Aguirre's *Daubert* motion as to Fisher (Doc. 181) is **GRANTED**. Fisher will not be permitted to testify.

6.  Defendants' *Daubert* motion as to Holmes (Doc. 182) is **DENIED**. Holmes will be permitted to testify.

7.  Defendants' *Daubert* motion as to McAndrew (Doc. 183) is **GRANTED**. McAndrew will not be permitted to testify.

8.  Defendants' *Daubert* motion as to Pusins (Doc. 184) is **GRANTED**.

Pusins will not be permitted to testify about Hemmert's state of mind, Birks, or the Sheriff. He will be permitted to testify about the reasonableness of Hemmert and Grossi's investigation.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on February 22, 2023.

ROY B. DALTON JR.
United States District Judge